EXXON CORP. *v.* CENTRAL GULF LINES, INC., ET AL.

No. 90–34.   Argued April 15, 1991—Decided June 3, 1991

MARSHALL, J., delivered the opinion for a unanimous Court.

*Armand Maurice Paré, Jr.*, argued the cause for petitioner. With him on the briefs was *Bradley F. Gandrup, Jr.*

*Stephen L. Nightingale* argued the cause for the United States as *amicus curiae* urging reversal. On the brief were *Solicitor General Starr, Assistant Attorney General Gerson, Deputy Solicitor General Shapiro, Harriet S. Shapiro*, and *Richard A. Olderman.*

*Francis A. Montbach* argued the cause for respondents. With him on the brief was *Karin A. Schlösser.*

JUSTICE MARSHALL delivered the opinion of the Court.

This case raises the question whether admiralty jurisdiction extends to claims arising from agency contracts. In *Minturn* v. *Maynard*, 17 How. 477 (1855), this Court held that an agent who had advanced funds for repairs and supplies necessary for a vessel could not bring a claim in admi-

ralty against the vessel's owners. *Minturn* has been interpreted by some lower courts as establishing a *per se* rule excluding agency contracts from admiralty. We now consider whether *Minturn* should be overruled.

I

This case arose over an unpaid bill for fuels acquired for the vessel, *Green Harbour ex William Hooper (Hooper)*. The *Hooper* is owned by respondent Central Gulf Lines, Inc. (Central Gulf) and was chartered by the Waterman Steamship Corporation (Waterman) for use in maritime commerce. Petitioner Exxon Corporation (Exxon) was Waterman's exclusive worldwide supplier of gas and bunker fuel oil for some 40 years.

In 1983, Waterman and Exxon negotiated a marine fuel requirements contract. Under the terms of the contract, upon request, Exxon would supply Waterman's vessels with marine fuels when the vessels called at ports where Exxon could supply the fuels directly. Alternatively, in ports where Exxon had to rely on local suppliers, Exxon would arrange for the local supplier to provide Waterman vessels with fuel. In such cases, Exxon would pay the local supplier for the fuel and then invoice Waterman. Thus, while Exxon's contractual obligation was to provide Waterman's vessels with fuel when Waterman placed an order, it met that obligation sometimes in the capacity of "seller" and other times in the capacity of "agent."

In the transaction at issue here, Exxon acted as Waterman's agent, procuring bunker fuel for the *Hooper* from Arabian Marine Operating Co. (Arabian Marine) of Jeddah, Saudi Arabia. In October 1983, Arabian Marine delivered over 4,000 tons of fuel to the *Hooper* in Jeddah and invoiced Exxon for the cost of the fuel. Exxon paid for the fuel and invoiced Waterman, in turn, for $763,644. Shortly thereafter, Waterman sought reorganization under Chapter 11 of the Bankruptcy Code; Waterman never paid the full amount

of the fuel bill. During the reorganization proceedings, Central Gulf agreed to assume personal liability for the unpaid bill if a court were to hold the *Hooper* liable *in rem* for that cost.

Subsequently, Exxon commenced this litigation in federal district court against Central Gulf *in personam* and against the *Hooper in rem.* Exxon claimed to have a maritime lien on the *Hooper* under the Federal Maritime Lien Act, 46 U. S. C. § 971 (1982 ed.).[1] The District Court noted that "[a] prerequisite to the existence of a maritime lien based on a breach of contract is that the subject matter of the contract must fall within the admiralty jurisdiction." 707 F. Supp. 155, 158 (SDNY 1989). Relying on the Second Circuit's decision in *Peralta Shipping Corp.* v. *Smith & Johnson (Shipping) Corp.*, 739 F. 2d 798 (CA2 1984), cert. denied, 470 U. S. 1031 (1985), the District Court concluded that it did not have admiralty jurisdiction over the claim. See 707 F. Supp., at 159–161. In *Peralta*, the Second Circuit held that it was constrained by this Court's decision in *Minturn* v. *Maynard, supra,* and by those Second Circuit cases faithfully adhering to *Minturn*, to follow a *per se* rule excluding agency contracts from admiralty jurisdiction. See *Peralta, supra,* at 802–804. The District Court also rejected the argument that Exxon should be excepted from the *Minturn* rule because it had provided credit necessary for the *Hooper* to purchase the fuel and thus was more than a mere agent. To create such an exception, the District Court reasoned, "'would blur, if not obliterate, a rather clear admiralty distinction.'" 707 F. Supp., at 161, quoting *Peralta, supra,* at 804.[2]

---

[1] The relevant provision of the Federal Maritime Lien Act has been amended and recodified at 46 U. S. C. § 31342.

[2] In the same action, Exxon also claimed a maritime lien on the *Hooper* for a separate unpaid fuel bill for approximately 42 tons of gas oil Exxon had supplied directly to the *Hooper* in New York. The District Court held that because Exxon was the "supplier" rather than an agent with respect to the New York delivery, the claim for $13,242 fell within the court's admiralty jurisdiction. The court granted summary judgment in Exxon's

The District Court denied Exxon's motion for reconsideration. The court first rejected Exxon's claim that in procuring fuel for Waterman it was acting as a seller rather than an agent. Additionally, the District Court declined Exxon's invitation to limit the *Minturn* rule to either general agency or preliminary service contracts.[3] Finally, the District Court determined that even if it were to limit *Minturn*, Exxon's contract with Waterman was both a general agency contract and a preliminary services contract and thus was excluded from admiralty jurisdiction under either exception. See 717 F. Supp. 1029, 1031–1037 (SDNY 1989).

The Court of Appeals for the Second Circuit summarily affirmed the judgment of the District Court "substantially for the reasons given" in the District Court's two opinions. App. to Pet. for Cert. A2, judgt. order reported at 904 F. 2d 33 (1990). We granted certiorari to resolve a conflict among the Circuits as to the scope of the *Minturn* decision[4] and to

favor on this claim. 707 F. Supp., at 161–162. This ruling is not at issue here.

[3] The preliminary contract rule, which excludes "preliminary services" from admiralty, was enunciated in the Second Circuit as early as 1881. See *The Thames*, 10 F. 848 (SDNY 1881) ("The distinction between preliminary services leading to a maritime contract and such contracts themselves have [sic] been affirmed in this country from the first, and not yet departed from"). In the Second Circuit, the agency exception to admiralty jurisdiction—the *Minturn* rule—has been fused with the preliminary contract rule. See *Cory Bros. & Co.* v. *United States*, 51 F. 2d 1010, 1012 (CA2 1931) (explaining *Minturn* as involving a preliminary services contract). In denying Exxon's motion for reconsideration, the District Court declined to "disentangle" the two rules, asserting that Circuit precedent had established the rule of *Minturn* "as a subset of the preliminary contract rule." 717 F. Supp. 1029, 1036 (SDNY 1989).

[4] Compare *E. S. Binnings, Inc.* v. *M/V Saudi Riyadh*, 815 F. 2d 660, 662–665, and n. 4 (CA11 1987) (general agency contracts for performance of preliminary services excluded from admiralty jurisdiction); and *Peralta Shipping Corp.* v. *Smith & Johnson (Shipping) Corp.*, 739 F. 2d 798 (CA2 1984) (all general agency contracts excluded), cert. denied, 470 U. S. 1031 (1985) with *Hinkins Steamship Agency, Inc.* v. *Freighters, Inc.*, 498 F. 2d 411, 411–412 (CA9 1974) *(per curiam)* (looking to the character of the work

consider whether *Minturn* should be overruled. 498 U. S. 1045 (1991). Today we are constrained to overrule *Minturn* and hold that there is no *per se* exception of agency contracts from admiralty jurisdiction.

## II

Section 1333(1) of Title 28 U. S. C. grants federal district courts jurisdiction over "[a]ny civil case of admiralty or maritime jurisdiction." In determining the boundaries of admiralty jurisdiction, we look to the purpose of the grant. See *Insurance Co.* v. *Dunham*, 11 Wall. 1, 24 (1871). As we recently reiterated, the "fundamental interest giving rise to maritime jurisdiction is 'the protection of maritime commerce.'" *Sisson* v. *Ruby*, 497 U. S. 358, 367 (1990), quoting *Foremost Ins. Co.* v. *Richardson*, 457 U. S. 668, 674 (1982). This case requires us to determine whether the limits set upon admiralty jurisdiction in *Minturn* are consistent with that interest.

The decision in *Minturn* has confounded many, and we think the character of that three-paragraph opinion is best appreciated when viewed in its entirety:

> "The respondents were sued in admiralty, by process *in personam*. The libel charges that they are owners of the steamboat Gold Hunter; that they had appointed the libellant their general agent or broker; and exhibits a bill, showing a balance of accounts due libellant for money paid, laid out, and expended for the use of re-

---

performed by a "husbanding agent" and concluding that the contract was maritime because the services performed were "necessary for the continuing voyage"); and *id.*, at 412 (arguably limiting *Minturn* to general agency as opposed to special agency contracts); and *Hadjipateras* v. *Pacifica*, *S. A.*, 290 F. 2d 697, 703–704, and n. 15 (CA5 1961) (holding an agency contract for management and operation of a vessel within admiralty jurisdiction and limiting *Minturn* to actions for "an accounting as such"). See also *Ameejee Valleejee & Sons* v. *M/V Victoria U.*, 661 F. 2d 310, 312 (CA4 1981) (espousing a "general proposition of law" that a general agent may not invoke admiralty jurisdiction while a special agent can).

spondents, in paying for supplies, repairs, and advertising of the steamboat, and numerous other charges, together with commissions on the disbursements, &c.

"The court below very properly dismissed the libel, for want of jurisdiction. There is nothing in the nature of a maritime contract in the case. The libel shows nothing but a demand for a balance of accounts between agent and principal, for which an action of *assumpsit*, in a common law court, is the proper remedy. That the money advanced and paid for respondents was, in whole or in part, to pay bills due by a steamboat for repairs or supplies, will not make the transaction maritime, or give the libellant a remedy in admiralty. Nor does the local law of California, which authorizes an attachment of vessels for supplies or repairs, extend to the balance of accounts between agent and principal, who have never dealt on the credit, pledge, or security of the vessel.

"The case is too plain for argument." 17 How. 477.

While disagreeing over what sorts of agency contracts fall within *Minturn*'s ambit, lower courts have uniformly agreed that *Minturn* states a *per se* rule barring at least some classes of agency contracts from admiralty. See n. 4, *supra.*[5]

*Minturn* appears to have rested on two rationales: (1) that the agent's claim was nothing more than a "demand for a balance of accounts" which could be remedied at common law through an action of *assumpsit;* and (2) that the agent had no contractual or legal right to advance monies "on the credit, pledge, or security of the vessel." The first rationale appears to be an application of the then-accepted rule that "the

---

[5] As early as 1870, however, this Court narrowed the reach of *Minturn* and cast doubt on its validity. See *The Kalorama*, 10 Wall. 204, 217 (1870) (distinguishing *Minturn* and allowing agents who had advanced funds for repairs and supplies for a vessel to sue in admiralty where it was "expressly agreed that the advances should be furnished on the credit of the steamer").

admiralty has no jurisdiction at all in matters of account between part owners," *The Steamboat Orleans* v. *Phoebus*, 11 Pet. 175, 182 (1837), or in actions in *assumpsit* for the wrongful withholding of money, see *Archawski* v. *Hanioti*, 350 U. S. 532, 534 (1956) ("A line of authorities emerged to the effect that admiralty had no jurisdiction to grant relief in such cases"). The second rationale appears to be premised on the then-accepted rule that a contract would not be deemed maritime absent a "hypothecation" or a pledge by the vessel's owner of the vessel as security for debts created pursuant to the contract. In other words, to sue in admiralty on a contract, the claimant had to have some form of a lien interest in the vessel, even if the action was one *in personam*. See *e. g.*, *Gardner* v. *The New Jersey*, 9 F. Cas. 1192, 1195 (No. 5233) (D. Pa. 1806); see generally, Note, 17 Conn. L. Rev. 595, 597–598 (1985).

Both of these rationales have since been discredited. In *Archawski*, *supra*, the Court held that an action cognizable as *assumpsit* would no longer be automatically excluded from admiralty. Rather, "admiralty has jurisdiction, even where the libel reads like *indebitatus assumpsit* at common law, provided that the unjust enrichment arose as a result of the breach of a maritime contract." 350 U. S., at 536. Only 16 years after *Minturn* was decided, the Court also cast considerable doubt on the "hypothecation requirement." In *Insurance Co.* v. *Dunham*, 11 Wall. 1 (1871), the Court explained that, in determining whether a contract falls within admiralty, "the true criterion is the nature and subject-matter of the contract, as whether it was a maritime contract, having reference to maritime service or maritime transactions." *Id.*, at 26. Several subsequent cases followed this edict of *Dunham* and rejected the relevance of the hypothecation requirement to establishing admiralty jurisdiction. See *North Pacific S. S. Co.* v. *Hall Bros. Marine Railway & Shipbuild-*

*ing Co.*, 249 U. S. 119, 126 (1919); *Detroit Trust Co.* v. *The Thomas Barlum*, 293 U. S. 21, 47–48 (1934).[6]

Thus, to the extent that *Minturn*'s theoretical underpinnings can be discerned, those foundations are no longer the law of this Court. *Minturn*'s approach to determining admiralty jurisdiction, moreover, is inconsistent with the principle that the "nature and subject-matter" of the contract at issue should be the crucial consideration in assessing admiralty jurisdiction. *Insurance Co.* v. *Dunham, supra*, at 26. While the *Minturn* Court viewed it as irrelevant "[t]hat the money advanced and paid for respondents was, in whole or in part, to pay bills due by a steamboat for repairs or supplies," the trend in modern admiralty case law, by contrast, is to focus the jurisdictional inquiry upon whether the nature of the transaction was maritime. See *e. g.*, *Kossick* v. *United Fruit Co.*, 365 U. S. 731, 735–738 (1961). See also *Krauss Bros. Lumber Co.* v. *Dimon S. S. Corp.*, 290 U. S. 117, 124 (1933) ("Admiralty is not concerned with the form of the action, but with its substance").

Finally, the proposition for which *Minturn* stands—a *per se* bar of agency contracts from admiralty—ill serves the purpose of the grant of admiralty jurisdiction. As noted, the admiralty jurisdiction is designed to protect maritime commerce. See *supra*, at 608. There is nothing in the nature of an agency relationship that necessarily excludes such relationships from the realm of maritime commerce. Rubrics

---

[6] These decisions were part of a larger trend started in the 19th century of eschewing the restrictive prohibitions on admiralty jurisdiction that prevailed in England. See *e. g.*, *Waring* v. *Clarke*, 5 How. 441, 454–459 (1847) (holding that the constitutional grant of admiralty jurisdiction did not adopt the statutory and judicial rules limiting admiralty jurisdiction in England); *The Propeller Genesee Chief* v. *Fitzhugh*, 12 How. 443, 456–457 (1852) (rejecting the English tide-water doctrine that "measure[d] the jurisdiction of the admiralty by the tide"); *Insurance Co.* v. *Dunham*, 11 Wall., at 26 (rejecting the English locality rule on maritime contracts "which concedes [admiralty] jurisdiction, with a few exceptions, only to contracts made upon the sea and to be executed thereon").

such as "general agent" and "special agent" reveal nothing about whether the services actually performed pursuant to a contract are maritime in nature. It is inappropriate, therefore, to focus on the status of a claimant to determine whether admiralty jurisdiction exists. Cf. *Sisson*, 497 U. S., at 364, n. 2 ("the demand for tidy rules can go too far, and when that demand entirely divorces the jurisdictional inquiry from the purposes that support the exercise of jurisdiction, it *has* gone too far").

We conclude that *Minturn* is incompatible with current principles of admiralty jurisdiction over contracts and therefore should be overruled. We emphasize that our ruling is a narrow one. We remove only the precedent of *Minturn* from the body of rules that have developed over what types of contracts are maritime. Rather than apply a rule excluding all or certain agency contracts from the realm of admiralty, lower courts should look to the subject matter of the agency contract and determine whether the services performed under the contract are maritime in nature. See generally *Kossick, supra,* at 735–738 (analogizing the substance of the contract at issue to established types of "maritime" obligations and finding the contract within admiralty jurisdiction).

## III

There remains the question whether admiralty jurisdiction extends to Exxon's claim regarding the delivery of fuel in Jeddah. We conclude that it does. Like the District Court, we believe it is clear that when Exxon directly supplies marine fuels to Waterman's ships, the arrangement is maritime in nature. See 707 F. Supp., at 161. Cf. *The Golden Gate*, 52 F. 2d 397 (CA9 1931) (entertaining an action in admiralty for the value of fuel oil furnished to a vessel), cert. denied *sub nom. Knutsen* v. *Associated Oil Co.*, 284 U. S. 682 (1932). In this case, the only difference between the New York delivery over which the District Court asserted jurisdiction, see n. 2, *supra*, and the Jeddah delivery was that, in Jeddah,

Exxon bought the fuels from a third party and had the third party deliver them to the *Hooper*. The subject matter of the Jeddah claim, like the New York claim, is the value of the fuel received by the ship. Because the nature and subject-matter of the two transactions are the same as they relate to maritime commerce, if admiralty jurisdiction extends to one, it must extend to the other. Cf. *North Pacific, supra*, at 128 ("[T]here is no difference in character as to repairs made upon . . . a vessel . . . whether they are made while she is afloat, while in dry dock, or while hauled up [on] land. The nature of the service is identical in the several cases, and the admiralty jurisdiction extends to all").[7] We express no view on whether Exxon is entitled to a maritime lien under the Federal Maritime Lien Act. That issue is not before us, and we leave it to be decided on remand.

The judgment of the Court of Appeals is reversed, and the case is remanded for further proceedings consistent with this opinion.

*It is so ordered.*

---

[7] As noted, the District Court regarded the services performed by Exxon in the Jeddah transaction as "preliminary" and characterized the rule excluding agency contracts from admiralty as "a subset" of the preliminary contract doctrine. See *supra*, at 607, and n. 3. This Court has never ruled on the validity of the preliminary contract doctrine, nor do we reach that question here. However, we emphasize that *Minturn* has been overruled and that courts should focus on the nature of the services performed by the agent in determining whether an agency contract is a maritime contract.