23 F.3d 842
 1994 A.M.C. 2463
 SOUTH CAROLINA STATE PORTS AUTHORITY, Plaintiff-Appellant,
v.
SILVER ANCHOR, S.A., (PANAMA); Oristis Christophides, a/k/a
Rusty Christophides, In Personam, Defendants-Appellees,
and
M/V LEVANT FORTUNE, (ex-Valiant), her engines, boilers,
tackle, furniture, equipment, freights and
apparel, In Rem equipment, freights, Defendant.
SOUTH CAROLINA STATE PORTS AUTHORITY, Plaintiff-Appellant,
v.
M/V LEVANT FORTUNE, (ex-Valiant), her engines, boilers,
tackle, furniture, equipment, freights and
apparel, In Rem, Defendant-Appellee,
and
Silver Anchor, S.A., (Panama), Claimant.
 Nos. 93-1855, 93-2292.
 United States Court of Appeals,
Fourth Circuit.
 Argued March 11, 1994.
Decided May 5, 1994.
 
 ARGUED: Michael Stanley Seekings, Robertson & Seekings, Charleston, SC, for appellant. Douglas Manning Muller, Buist, Moore, Smythe & McGee, Charleston, SC, for appellee. ON BRIEF: John H. Cooper, Charles H. Raley, Jr., Cooper & Raley, Charleston, SC, for appellant. Benjamin Allston Moore, Jr., Buist, Moore, Smythe & McGee, Charleston, SC, for appellee.
 Before PHILLIPS, MURNAGHAN, and HAMILTON, Circuit Judges.
 Affirmed in part, reversed in part, and remanded by published opinion. Judge MURNAGHAN wrote the opinion, in which Judge PHILLIPS and Judge HAMILTON joined.
 OPINION
 MURNAGHAN, Circuit Judge:
 
 
 1
 On appeal are two consolidated actions, both brought by the South Carolina State Ports Authority ("the SPA"): an in personam action against Orestes G. "Rusty" Christophides and a Panamanian company, Silver Anchor, S.A., for breach of an oral contract; and an in rem action against Silver Anchor's vessel, M/V Levant Fortune (formerly known as the Valiant), for enforcement of a maritime lien. The district court dismissed the in personam action for lack of subject-matter jurisdiction and granted summary judgment to the defendant vessel in the in rem action. The SPA now appeals.
 
 
 2
 * The South Carolina State Ports Authority is a quasi-state agency that provides maritime services (e.g., crane rental, cargo handling and storage, wharfage, and dockage) to ships calling on the Port of Charleston. For more than two decades, "Rusty" Christophides has dealt with the SPA as the spokesperson, representative, or agent of Pharos Lines or various other companies sailing ships in and out of the Port. It is from those business dealings that the present actions arose.
 
 
 3
 Through much of the late 1980s, Pharos's line of credit with the SPA was consistently delinquent. On November 27, 1989, when the outstanding balance on Pharos's account had swelled to more than $400,000, Christophides met with W. Don Welch, the Executive Director of the SPA, to negotiate a mutually satisfactory accommodation. They eventually reached a compromise: the SPA would be paid $75,000 immediately before each Charleston port call made by the P.S. Palios or the Valiant (both of which were operated by Pharos Lines[1]) and another $15,000 between each pair of port calls. Because each ship would incur only about $55,000 in current charges per port call, the excess would be applied to reduce Pharos Lines' outstanding debt. On behalf of the SPA, Welch agreed to continue providing maritime services to Pharos Lines vessels in the future and not to seek enforcement of its maritime liens against (i.e., to seize) the P.S. Palios or the Valiant, as it was entitled to do under the Federal Maritime Lien Act, 46 U.S.C.App. Sec. 971 et seq.
 
 
 4
 According to Welch's testimony, at the November 27 meeting he asked for Christophides's personal promise that the debt would actually be paid down, regardless of Pharos Lines' financial condition, and Christophides responded, "Don't worry about it, I'm not going anywhere. I will pay the debt, if it has to be that way." Christophides has denied ever making such a personal guaranty, and has testified that, in his capacity as Pharos Lines' representative, he merely assured Welch that he "would do [his] best and ... would get the money for him."
 
 
 5
 In the months that followed, the SPA rendered an additional $200,000 worth of maritime services to ships operated by Pharos Lines, and the SPA continued to forebear its maritime rights to seize the ships. Some payments were made to the SPA under the negotiated debt payment plan, but the payment schedule was abandoned before Pharos Lines went bankrupt in 1990.
 
 
 6
 In June 1990 the bank that held the Valiant's mortgage had the ship seized by order of a Greek court. Other creditors, including the SPA, intervened in the proceedings to assert their respective claims. The Greek court ordered a public sale of the vessel in late 1990, but it was postponed when the SPA and two other American lienholders challenged the minimum bid price at which the vessel could be sold. The SPA succeeded in raising the minimum bid price by several hundred thousand dollars, and the Valiant was subsequently sold at public auction in Greece for $2.376 million. As of the time of oral argument in the instant appeal, the SPA had yet to receive any proceeds from that sale.
 
 
 7
 The purchaser at the Greek judicial sale was a Panamanian company owned, in large part, by none other than Rusty Christophides. A few months later, that company sold the ship, again for $2.376 million, to Silver Anchor, S.A., a newly-formed Panamanian corporation in which Christophides also is a director and a major shareholder. Silver Anchor renamed the vessel "M/V Levant Fortune." Notwithstanding their ability to purchase the Valiant, Christophides and the businesses with which he is associated apparently were unable or unwilling to pay the SPA for its maritime services as Christophides had allegedly promised at the November 27, 1989 meeting.
 
 
 8
 On May 31, 1991, the SPA filed an action in the United States District Court for the District of South Carolina against Silver Anchor and Christophides in personam for breach of the oral contract of November 27, 1989, and against the M/V Levant Fortune in rem for enforcement of a maritime lien. The SPA obtained a writ of attachment and seized the vessel. The defendants moved for dismissal, contending (1) that the in personam claim should be dismissed because the federal district court lacked subject-matter jurisdiction, as the alleged guaranty was not a "maritime contract,"[2] and (2) that the maritime lien claim in rem should be dismissed because the Greek judicial sale had extinguished the SPA's lien. The SPA dropped its in rem claim, proceeded solely against Christophides and Silver Anchor on the contract claim, and later released the vessel. The district judge granted the defendants' motion to dismiss for lack of subject-matter jurisdiction, and the SPA appealed.
 
 
 9
 In January 1992 we reversed the district court's judgment and remanded the case with instructions to develop further the factual record. See South Carolina State Ports Auth. v. Silver Anchor, S.A. (Panama), Nos. 91-2567 & 91-2600, 953 F.2d 639 (Table), 1992 WL 14591, 1992 U.S.App. LEXIS 1163 (4th Cir. Jan. 31, 1992) (unpublished per curiam opinion) [hereinafter Silver Anchor I ]. Upon remand, and following the taking of depositions by all parties, the defendants renewed their motion to dismiss the in personam action for lack of jurisdiction.
 
 
 10
 Meanwhile, the SPA filed a new suit in rem against the M/V Levant Fortune and again seized the ship. The SPA then moved to amend its complaint in the in personam case to add an in rem cause of action. The district judge denied the motion to amend, and scheduled an evidentiary hearing on the jurisdictional issue. Following that hearing, the court again granted the defendants' motion to dismiss the in personam claim for lack of jurisdiction. The court found that Christophides had made no personal promise or guaranty at the November 27 meeting and therefore held that the SPA had no enforceable contract against him. In the alternative, the court held that, even if there was a contract, it was not a maritime contract because the SPA did not provide maritime services to vessels in which Christophides had "an ownership interest." Three months later, the same district court granted the defendant vessel's motion for summary judgment on the in rem claim. The SPA timely appealed from both judgments, and we consolidated the appeals.
 
 II
 
 11
 In addressing the question of whether the district court again erred in dismissing the in personam action against Christophides and Silver Anchor for lack of subject-matter jurisdiction, we will review each of the court's alternative holdings. Thus, the appeal from the dismissal presents two issues: whether the alleged "maritime contract" was (1) maritime, and (2) a contract.
 
 
 12
 * The court below held that, even if there was a contract between the SPA and Christophides, it was not a maritime contract and, therefore, the SPA could not invoke the federal court's admiralty jurisdiction. Congress has granted federal district courts original jurisdiction over "[a]ny civil case of admiralty or maritime jurisdiction." 28 U.S.C. Sec. 1333(1). When confronted with issues of admiralty jurisdiction over contracts, courts "look to the subject matter of the ... contract and determine whether the services performed under the contract are maritime in nature." Exxon Corp. v. Central Gulf Lines, Inc., 500 U.S. 603, 612, 111 S.Ct. 2071, 2077, 114 L.Ed.2d 649 (1991) (citing Kossick v. United Fruit Co., 365 U.S. 731, 735-38, 81 S.Ct. 886, 890-92, 6 L.Ed.2d 56 (1961)). As Justice Harlan explained in Kossick, "[t]he boundaries of admiralty jurisdiction over contracts--as opposed to torts or crimes--being conceptual rather than spatial, have always been difficult to draw. Precedent and usage are helpful insofar as they exclude or include certain common types of contract...." 365 U.S. at 735, 81 S.Ct. at 890.[3] Very little in the way of general principles can be extrapolated from the case law. Perhaps Professor Black put it best when he wrote that "[t]here is about as much 'principle' [in admiralty contract jurisdiction] as there is in a list of irregular verbs." Charles L. Black, Jr., Admiralty Jurisdiction: Critique and Suggestions, 50 Colum.L.Rev. 259, 264 (1950), quoted in Sisson v. Ruby, 497 U.S. 358, 372 n. 4, 110 S.Ct. 2892, 2901 n. 4, 111 L.Ed.2d 292 (1990) (Scalia, J., concurring in the judgment).
 
 
 13
 Fortunately, in the present case, we need not wade into the minutiae of admiralty contract jurisdiction, as this appeal is largely controlled by the law of the case, which we laid down in Silver Anchor I, supra. In that decision, we acknowledged that, in the aftermath of the November 27, 1989 meeting, the SPA had provided some "additional maritime services" to vessels that were somehow connected to Christophides. At that point in the litigation, however, the record evidence provided an inadequate basis for determining whether the SPA had provided those additional maritime services "in a way that directly benefited Christophides." Therefore, we remanded the case for further development of evidence indicating the extent of the maritime services that the SPA had agreed to render in exchange for Christophides's alleged guaranty, and the extent to which Christophides or Silver Anchor would have actually benefited from those services. See Silver Anchor I.
 
 
 14
 On remand, the district court found--and the parties here do not dispute--that the SPA provided substantial maritime services to at least two vessels operated by Pharos Lines--the P.S. Palios and the Valiant. Our instructions focused on the extent to which Christophides or Silver Anchor benefited from those services. The district court erred, however, by focusing instead on a narrower question: whether Christophides had an ownership interest in the P.S. Palios or the Valiant. Finding that Christophides had no ownership interest in either ship, the court dismissed for want of jurisdiction. Because the district court misconstrued our instructions on remand and thereby misapplied the law of the case, it ignored the many ways in which Christophides actually benefited from the SPA's provision of maritime services and therefore it reached the wrong conclusion.
 
 
 15
 By his own admission, Christophides stood to benefit considerably from the SPA's provision of maritime services following the meeting of November 27, 1989. He testified that: (1) he was a director, shareholder, and employee of Constellation Navigation, Inc., which acted as the general steamship agent for Pharos Lines, which operated both the P.S. Palios and the Valiant (which in turn received maritime services from the SPA); (2) he was the President, shareholder, and employee of Trident Shipping Lines, Inc., which acted as the local port agent in Charleston for Pharos Lines; (3) he and his wife had at least a tangential interest as creditors in the Valiant (in the amount of $200,000); (4) he was one of several written guarantors of the mortgage on the Valiant; (5) he had "represented ... to a lot of people, [including the SPA's] Don Welch" that he had "some influence" on the Valiant; and (6) he believed that it was "[a]bsolutely" to his personal, financial benefit that the SPA allow Pharos Lines to continue in operation at least through February 1990.
 
 
 16
 Although the district court correctly found that no vessels in which Christophides had an ownership interest received maritime services from the SPA after November 27, 1989, it erred in ignoring the above-listed non-title interests that Christophides had in the two vessels that did receive such services. Therefore, the lower court incorrectly concluded that the SPA could not invoke admiralty jurisdiction because the services that the SPA performed for Christophides under the contested contract were not sufficiently "maritime" in nature.
 
 B
 
 17
 Next we must address the district court's alternative holding: that there was no contract (maritime or non-maritime) between Christophides and the SPA because the former never gave the latter his personal promise or guaranty at the November 27, 1989 meeting. By the district court's logic, it was reasoned that the SPA could not invoke the federal district court's admiralty jurisdiction over contracts where there was no contract. Hence, the court felt that it had no choice but to dismiss the case for want of jurisdiction.
 
 
 18
 As an initial matter, we note that our opinion in Silver Anchor I was premised on the assumption that there was a contract between Christophides and the SPA.[4] We instructed the district court to determine only whether that contract was maritime or non-maritime in nature. We did not instruct the lower court to engage in a freewheeling inquiry about whether any contract even existed. Thus, just as the district court misread our instructions on the maritime/non-maritime issue, see supra Part II-A of this opinion, it also ignored our instructions when it found that Christophides never gave the SPA the alleged personal guaranty.
 
 
 19
 Moreover, the question of whether or not Christophides actually gave his personal guaranty to the SPA is the very linchpin of the case--precisely the sort of factual issue that should be resolved by a proceeding on the merits, not by a jurisdictional ruling. See Bell v. Hood, 327 U.S. 678, 682-83, 66 S.Ct. 773, 776, 90 L.Ed. 939 (1946); see also Plumer v. Maryland, 915 F.2d 927, 932 n. 5 (4th Cir.1990); Adams v. Bain, 697 F.2d 1213, 1219 (4th Cir.1982) (holding that "where the jurisdictional facts are intertwined with the facts central to the merits of the dispute, ... the entire factual dispute is appropriately resolved only by a proceeding on the merits" and it is inappropriate to dismiss the case for lack of subject-matter jurisdiction); 2A James Wm. Moore & Jo Desha Lucas, Moore's Federal Practice p 12.07[2.-1], at 12-60 (2d ed. 1994).[5]
 
 
 20
 In the present case, whether Christophides actually gave the SPA a personal guaranty is dispositive on the merits: if there was no guaranty, he wins; if there was a guaranty, he loses. To the extent that Christophides was challenging the court's jurisdiction on the ground that he gave no personal guaranty, he was also challenging the very existence of the SPA's cause of action for breach of that guaranty. In such a case, "the proper course of action is for the district court to accept jurisdiction and address the objection as an attack on the merits" of the plaintiff's case. Rivanna Trawlers Unltd. v. Thompson Trawlers, Inc., 840 F.2d 236, 239 (4th Cir.1988) (Powell, J., sitting by designation). Where the plaintiff sues for breach of an oral maritime contract and the defendant denies the existence of any such agreement, the district court should assume that admiralty jurisdiction exists and proceed to determine the merits of the claim. See, e.g., Union Fish Co. v. Erickson, 248 U.S. 308, 311-14, 39 S.Ct. 112, 112-13, 63 L.Ed. 261 (1919); Hellenic Lines Ltd. v. Gulf Oil Corp., 340 F.2d 398, 399-402 (2d Cir.1965).[6]
 
 
 21
 Instead, the district court effectively allowed Christophides to argue the merits in the guise of a jurisdictional dispute, much to his advantage. Had the case proceeded to the merits, it is unlikely that Christophides could have prevailed either on a motion for a Rule 12(b)(6) dismissal for failure to state a claim--which would have required the court to accept as true all of the SPA's allegations--or even on a motion for summary judgment--which would have required the court to draw all inferences of fact against him and in favor of the SPA. At a full-fledged trial on the merits, the SPA would have been properly on notice to present all of its evidence that Christophides had given a personal guaranty. As the district court conducted the proceedings, however, the SPA was effectively ambushed, forced to argue the very existence of a contract whose existence had already been conclusively presumed by this Court. Therefore, we must again remand the in personam claim, this time for further proceedings on the merits.
 
 III
 
 22
 In the in rem action against the M/V Levant Fortune (formerly the Valiant), the district court granted the defendant vessel's motion for summary judgment, finding that the Greek judicial sale of the Valiant had extinguished the maritime lien asserted by the SPA. Reviewing the district court's ruling de novo, we affirm.
 
 
 23
 The present case is squarely controlled by our precedent in Gulf & Southern Terminal Corp. v. S.S. President Roxas, 701 F.2d 1110 (4th Cir.), cert. denied, 462 U.S. 1133, 103 S.Ct. 3115, 77 L.Ed.2d 1369 (1983). In President Roxas, we stated that a judicial sale of a vessel by a court of a sovereign nation will extinguish a maritime lien if (1) the foreign court had personal jurisdiction over the lienholder; (2) the foreign court acted in a valid in rem proceeding; or (3) the foreign court's proceedings were sufficiently similar to an in rem proceeding to make its decree recognizable by and binding on the American courts. In President Roxas, we specifically held that a Mexican bankruptcy court's decree had extinguished an existing maritime lien. We noted that the S.S. President Roxas had been an asset of the bankrupt, under the control and proper jurisdiction of the Mexican court, and that the Mexican court had provided adequate notice to the world that the vessel was being sold free of liens and encumbrances. Therefore, we recognized the validity of the Mexican court's decree. Without the broad international recognition of such foreign judicial sales, we explained, a purchaser could never anticipate what additional claims might be asserted in other countries with different laws. See id. at 1111-12.
 
 
 24
 In the present case, the district court properly concluded that the Greek court also employed procedures virtually identical to those denominated as an in rem proceeding under American law. The vessel was seized by a creditor holding a specific property right in the vessel (i.e., the ship's mortgage). Creditors holding the equivalent of maritime liens, including the SPA, were allowed to intervene. And the ship was sold free and clear of liens and encumbrances under Greek law.[7] Given the similarities between the Greek proceedings and an American in rem proceeding, the defendant vessel was entitled to judgment as a matter of law under our President Roxas test.
 
 
 25
 The SPA attempts to distinguish President Roxas on the ground that Greece--unlike Mexico--is a signatory to the "Brussels Convention," the International Convention Relating to the Arrest of Sea-Going Ships, May 10, 1952, 439 U.N.T.S. 193. In attempting to argue that Greece's status as a signatory to the Brussels Convention is legally relevant here, the SPA relies almost entirely upon the Fifth Circuit's decisions in Perez & Compania (Cataluna) v. M/V Mexico I, 826 F.2d 1449, 1450-51 (5th Cir.1987), and Belcher Co. v. M/V Maratha Mariner, 724 F.2d 1161, 1163-65 (5th Cir.1984). The SPA's reliance on those cases is misplaced. Under the controlling Fourth Circuit precedent, the relevant question is not whether a country has signed the Brussels Convention, but rather whether it affords lienholders procedural and substantive protections sufficiently similar to those available in an American in rem proceeding. See President Roxas, 701 F.2d at 1111-12. Moreover, even under Fifth Circuit law, the SPA's in rem claim against the M/V Levant Fortune apparently would be barred by the Greek judicial sale. See, e.g., Crescent Towing & Salvage Co. v. M/V ANAX, Civ. A. No. 93-0675, 1993 WL 293274, 1993 U.S.Dist. LEXIS 10613 (E.D.La. July 26, 1993) (applying Fifth Circuit law and holding that the judicial sale of the defendant vessel in Greece pursuant to Greek law, as ordered by a Greek court with jurisdiction, had extinguished a maritime lien that an American company asserted against the vessel). Therefore, we affirm the district court's grant of summary judgment.[8]
 
 IV
 
 26
 Accordingly, we affirm the district court's judgment with regard to the in rem claim, and we reverse the district court's judgment with regard to the in personam claim and remand that claim for further proceedings on the merits.
 
 
 27
 AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.
 
 
 
 [1]
 Both ships were operated by Pharos Lines and were owned by another company which had the same shareholders, in the same proportion
 
 
 [2]
 The parties were not of diverse citizenship
 
 
 [3]
 For example, a contract to repair or to insure a ship is maritime, but a contract to build a ship is not. Of greater relevance to the case at hand, contracts for wharfage, dockage, and crane rental are maritime. See 1 Steven F. Friedell, Benedict on Admiralty Secs. 181-191, at 12-1 to 12-55 (7th ed. 1994) (Maritime Contracts); Grant Gilmore & Charles L. Black, Jr., The Law of Admiralty Sec. 1-10, at 22-31 (2d ed. 1975); 7A James Wm. Moore & Alfred S. Palaez, Moore's Federal Practice pp .225-.300, at 2701-3325 (2d ed. 1993) (Contracts Within the Admiralty and Maritime Jurisdiction). Furthermore, contracts of personal guaranty or indemnity relating to marine ventures are generally deemed within the admiralty jurisdiction. See, e.g., Compania Maritima Ador, S.A. v. Navico A.G., 173 F.Supp. 839, 840 (S.D.N.Y.1959) ("One who guarantees his principal's maritime obligation may be sued on his guarantee in admiralty.")
 
 
 [4]
 The very existence of the alleged contract in the present case is subject to dispute primarily because it was oral. Admiralty law has long recognized the validity of oral contracts. See Kossick, 365 U.S. at 734 & n. 4, 81 S.Ct. at 889-90 & n. 4; see also American Dredging Co. v. Miller, --- U.S. ----, ----, 114 S.Ct. 981, 987, 127 L.Ed.2d 285 (1994)
 
 
 [5]
 The Supreme Court has recognized only two exceptions to the above-stated rule against dismissal: (1) if the claim "clearly appears to be immaterial and made solely for the purpose of obtaining jurisdiction"; and (2) if the claim "is wholly insubstantial and frivolous." Bell v. Hood, 327 U.S. at 682-83, 66 S.Ct. at 776. Neither exception applies here
 
 
 [6]
 Of course, if a district court should determine that the contract--assuming arguendo that it does exist--was not maritime, it may dismiss for lack of admiralty jurisdiction. As explained supra at Part II-A of this opinion, the district court in the present case could not have properly held that the alleged contract between Christophides and the SPA was non-maritime
 
 
 [7]
 Indeed, as the court below noted, the SPA received greater protection in the Greek court than the President Roxas plaintiff received in the Mexican bankruptcy court: the SPA participated fully in the Greek proceeding and is apparently now entitled to substantial proceeds from the sale that followed
 
 
 [8]
 The defendant-appellee argues in the alternative that the Greek judicial sale extinguished the SPA's maritime lien because the SPA submitted itself to the personal jurisdiction of the Greek court. See President Roxas, 701 F.2d at 1111 (stating that a judicial sale of a vessel by a foreign court extinguishes a maritime lien if that court had personal jurisdiction over the lienholder). Because we have concluded that the Greek proceedings were sufficiently similar to an American in rem proceeding, we need not address that alternative argument
 We also do not address the SPA's appeal from the denial of its motion to amend its complaint in the in personam case to reassert an in rem claim, as our decision renders that motion moot.