ARGO SYSTEMS FZE, Plaintiff,

v.

LIBERTY INSURANCE PTE. LTD.; Marine Insurance Services Pte. Ltd.; Dewitt Stern Group, Inc.; and Dewitt Stern, Imperatore, Ltd., Defendants.

Civil Action No. 04–0321–CG–M.

United States District Court, S.D. Alabama, Southern Division.

Sept. 27, 2007.

---

David C. Hannan, Thomas S. Rue, John-stone, Adams, Bailey, Gordon & Harris, Mobile, AL, Michael C. Bynane, Houston, TX, for Plaintiff.

Norman Matt Stockman, Blane H. Crutchfield, Blane H. Crutchfield, Hand Arendall, L.L.C., Mobile, AL, Robert M. Sullivan, Nicoletti Hornig Campise Sweeny & Paige, New York, NY, for Defendants.

## MEMORANDUM OPINION AND ORDER

CALLIE V.S. GRANADE, Chief Judge.

A bench trial was held before the undersigned from September 11, 2006, to September 14, 2006. Upon consideration of all evidence presented, and for the reasons stated herein, the court finds in favor of the defendants.

## I. FACTS

Plaintiff Argo Systems FZE (hereinafter "Argo"), a limited liability company organized under the laws of Dubai, United Arab Emirates, purchased the M/V COPA CASINO on March 6, 2003 [1] with the intention of sending it to India. (Doc. 1 at 6). Plaintiff relied on defendant, Dewitt Stern, Imperatore, Ltd. (hereinafter "DSI"), a marine insurance broker, to obtain suitable tow risk coverage for the voyage to India. (*Id.* at 8). In arranging insurance for the voyage, DSI conducted business solely with London Special Risks (hereinafter "LSR"), which served as the exclusive conduit for Liberty Insurance Pte. Ltd. (hereinafter "Liberty") and Marine Insurance Services Pte. Ltd. (hereinafter "MIS") (Collectively referred to as "underwriters"). (Doc. 32 at 9).

The communications between LSR and underwriters in connection with the contract of insurance coverage began on or around November 27, 2002. (Doc. 34, Ex. M). According to a February 11, 2003, fax, MIS Managing Director Richard Yeo, requested that LSR provide a faxed copy of the trip in tow survey and/or recommendation when carried out. (Doc. 53, Ex. A). Yeo followed up with another fax on February 24, 2003, which included the insurance slip covering the venture, signed by

---

1. Argo's intent to purchase the M/V COPA CASINO can be traced back to late fall 2002. (Doc. 32 at 10). Argo worked with Richard Jaross, a ship broker, over the course of Argo's acquisition, which came to fruition on March 6, 2003. (Doc. 1 at 6).

Yeo. (Doc. 53, Ex. B). The signed insurance slip explicitly articulated that coverage for the voyage extended "[f]rom time taken in tow by tug 'FAIRPLAY XIV' Gulf Port in Mississippi, thence in single tow, on or about 25th Feb. 2003, to Alang, India and until safe arrival there." (*Id.* at 2). The February 24 communication contained a message in which Yeo requested "a copy of Towage Survey before departure to ensure ... agreement." (*Id.* at 1). Yeo also asked that LSR provide a copy of the survey "to see whether acceptable and whether [underwriters] need other items to be carried out before commencement of the tow." (*Id.* at 3).

On February 27, 2003, Franklin Skinner, the duly appointed marine surveyor, conducted and completed the trip in tow survey of the M/V COPA CASINO. (Doc. 51 at 2). Skinner's survey indicated that he conducted an inspection of the vessel "for the purpose of determining the suitability to endure a voyage from Mobile, Alabama, USA, to Alang, India...."[2] (Doc. 53, Ex. G). Nigel Roberts of LSR faxed a copy of Skinner's trip in tow survey to Yeo at MIS on March 1, 2003. (Doc. 51 at 2). On March 3, 2003, Yeo responded to LSR and acknowledged receipt of Robert's March 1 facsimile, which included the trip in tow survey, and stated that MIS would "hold covered from time of taking in tow by Tug on or about 6:00 a.m. EST, 2nd March 2003." (Doc. 53, Ex. I). Eight days later, Yeo confirmed coverage, acknowledged receipt of the net premium and provided that the policy would follow in due course. (Doc. 53, Exs. J, K, L). Yeo, however, maintains that he believed the vessel was to depart from Gulfport. (Doc. 73–2, Ex. A at 11).

The M/V COPA CASINO departed Mobile, Alabama, on the morning of March 3, 2003, taken in tow by the tug FAIRPLAY XIV. (Doc. 1 at 11). By the twelfth day of the voyage the tug observed that the vessel had acquired a 5 to 7 degree list to starboard. (*Id.*). The weather conditions, which plaintiff submits were consistently between "fresh and strong" from days nine through twelve, continued into the thirteenth day. (*Id.* at 12). On March 16, 2003, as the vessel's condition worsened, the tug cut the wire. (*Id.* at 13). Less than four hours later, the tug noted that the vessel sank. (*Id.*).

"Following the total loss of the COPA CASINO, Argo notified [u]nderwriters of the loss and made its claim under the tow risk policy for the total amount of proceeds provided therein." (*Id.* at 14). Underwriters denied coverage for two principal reasons: 1) the vessel was unseaworthy at the inception of the voyage, and 2) the vessel encountered winds and seas outside of weather parameters recommended by Argo's surveyor, Franklin Skinner. (*Id.* at 13–14). Plaintiffs filed suit against underwriters and DSI on various theories of liability. (*Id.* at 17).

In its order dated March 30, 2006, this court held that it lacked personal jurisdiction as to Liberty and MIS. (Doc. 127). Specifically, the court opined that:

> The record fails to establish that defendants "purposefully derived benefit" from their Alabama contacts, *Burger King[v. Rudzewicz]*, 471 U.S. [462]at 473[, 105 S.Ct. 2174, 85 L.Ed.2d 528] [1985], or "manifestly ... availed [themselves] of the privilege of conducting business [in Alabama] ... shielded by 'the benefits and protections' of [Ala-

---

**2.** In December 2002, the M/V COPA CASINO was moved to Mobile, Alabama, where she remained until her departure for India on March 3, 2003. (Doc. 1 at 5). Employees of both brokers, DSI and LSR, were aware that the vessel was to depart for India from the port of Mobile, Alabama. (Doc. 30, Ex. 2).

bama] laws", *Id.* at 476[, 105 S.Ct. 2174]. Any contacts defendants had with the forum state resulted from plaintiff's unilateral activity, that is, to alter the port of departure from Gulf Port, Mississippi, to Mobile, Alabama, and are thus not attributable to the defendants. Since defendants' actions were not expressly directed at Alabama, the court concludes that defendants could not reasonably anticipate being haled into court in that forum. Accordingly, the contacts relied upon by plaintiff fail to pass muster under the minimum contacts rubric.

(Doc. 127 at 12). A bench trial was held before this court from September 11, 2006, to September 14, 2006. At trial, plaintiff presented claims of negligence and negligent misrepresentation as against DSI. (Doc. 168 at 2).

## II. FINDINGS OF FACT AND CONCLUSIONS OF LAW

The parties have presented the issues in this case as follows:

1. Whether DSI was negligent in obtaining the coverages or failed to obtain the requisite coverages to protect the venture.

2. Whether DSI was negligent in misrepresenting that the venture was covered by full and complete tow risk insurance coverage.

3. Whether the loss of the vessel was a result of an insured risk.

4. Whether Underwriters would have been liable to Argo for loss of the vessel pursuant to the terms of the policy.

5. If the loss of the vessel was attributable to the Tug FAIRPLAY XIV and its crew, whether the loss was an insured risk.

6. Whether the value fixed by the policy, i.e., $1,225,000, is conclusive as to the insurable value of the subject intended to be insured.

(Doc. 148 at 29–30).

### A. Admiralty Jurisdiction

■ Before reaching the substantive questions presented, the court must address whether plaintiff's negligence claims fall under the ambit of admiralty jurisdiction. Plaintiff alleges that its arrangement with DSI to procure marine insurance coverage is subject to admiralty jurisdiction. (Doc. 168 at 8). Plaintiff asserts that, pursuant to *Exxon v. Cent. Gulf Lines, Inc.,* 500 U.S. 603, 111 S.Ct. 2071, 114 L.Ed.2d 649 (1991), "agency arrangements related to securing a maritime contract are themselves subject to admiralty jurisdiction." (Doc. 168 at 8). Thus, plaintiff posits that "[i]f the same operative facts give rise to a claim for breach of contract that is acknowledged to be within admiralty jurisdiction, then a tort arising from the same facts ought to be considered within admiralty." (Id. at 13). In response, defendant cites *Broughton v. Florida Int'l Underwriters,* 139 F.3d 861, 864–65 (11th Cir.1998), for the sweeping proposition that "federal courts do not have admiralty jurisdiction over claims against an insurance broker." (Doc. 170 at 26). Although the holding of *Broughton* may not be as broad as defendant suggests, this court declines to extend admiralty jurisdiction over plaintiff's claims here, both of which sound in tort.

Federal district courts possess exclusive original jurisdiction to hear civil cases arising in admiralty under 28 U.S.C. § 1333(1). The inquiry for determining the existence of admiralty jurisdiction varies depending upon the nature of the claim asserted. *Broughton,* 139 F.3d at 864. In *Exxon,* 500 U.S. 603, 111 S.Ct. 2071, the Supreme Court expanded the scope of what types of contracts are considered maritime, holding that "there is no per se

exception of agency contracts from admiralty jurisdiction." *Id.* at 608, 111 S.Ct. 2071. Accordingly, when confronting issues of admiralty jurisdiction in connection with contract claims, "lower courts should look to the subject matter of the ... contract and determine whether the services performed under the contract are maritime in nature." *Id.* at 612, 111 S.Ct. 2071 (citation omitted). Because plaintiff's claims are premised upon tort principles, however, *Exxon* is inapplicable to the case at bar.[3] Instead, this court turns to the paradigm set forth by the Eleventh Circuit for examining whether tort claims are cognizable under admiralty jurisdiction:

> "[T]he activity from which the claim arises must satisfy a location test and it must have sufficient connection with maritime activity." *Alderman v. Pacific N. Victor, Inc.*, 95 F.3d 1061, 1064 (11th Cir.1996) (*citing Jerome B. Grubart, Inc. v. Great Lakes Dredge & Dock Co.*, 513 U.S. 527, 534, 115 S.Ct. 1043, 1048, 130 L.Ed.2d 1024 (1995)). To satisfy the location test, the tort must have occurred on navigable water or the injury suffered on land must have been caused by a vessel on navigable water. *Jerome B. Grubart, Inc.*, 513 U.S. at 534, 115 S.Ct. at 1048. With respect to the connection test, two issues must be considered: (1) whether, upon assessment of the general features of the type of accident involved, the "incident has a potentially disruptive impact on maritime commerce;" and (2) "whether the general character of the activity giving rise to the incident shows a substantial relationship to traditional maritime activity." *Jerome B. Grubart, Inc.*, 513 U.S. at 534, 115 S.Ct. at 1048 (internal quotations and citation omitted).

*Broughton,* 139 F.3d at 865.

In this case, similar to *Broughton,* the alleged negligent acts of defendant did not occur on navigable waters; nor is this a case in which an injury suffered on land was caused by a vessel on navigable water. Although there may be some connection between the alleged tort and traditional maritime activity, the location test for admiralty jurisdiction is not satisfied here. It follows that this court does not have admiralty jurisdiction over plaintiff's claims. This finding does nothing to disturb the court's previous ruling that it has subject matter jurisdiction based upon diversity of parties.

**B. The Claims**

Plaintiff seeks to recover compensation for the proceeds of a marine tow-risk insurance policy to which plaintiff contends it "would have been entitled from the underwriters ... for the total loss of the M/V COPA CASINO, but for broker's failure to obtain the coverage that Argo thought it had bought and paid for." (Doc. 168 at 1). According to plaintiff, "as a result of [DSI's] professional negligence, the vessel broke ground on its final voyage without the benefit of having the insurance coverage in place that [it] had retained [DSI] to procure from [u]nderwriters." (Doc. 171 at 1). Plaintiff predicates its theory of liability upon this court's order, in which it dismissed underwriter defendants for lack

---

3. Plaintiff's argument that this court should proceed in admiralty for purposes of uniformity is unavailing. A finding that a contract claim may fall within a court's admiralty jurisdiction does not necessitate the same for a tort claim. *See, e.g., Dao v. Knightsbridge Int'l Reinsurance Corp.*, 15 F.Supp.2d 567 (D.N.J. 1998) (holding that plaintiff's contractual claims were within the court's admiralty jurisdiction, but the tort based claims were not). The rationale underlying the finding in *Doe v. Celebrity Cruises, Inc.*, 394 F.3d 891 (11th Cir.2004), where the Eleventh Circuit concluded that a tort claim should proceed in admiralty because a crew member's duty to a passenger "should be uniform and not vary from port to port on a single cruise," is inapplicable here. *Id.* at 902.

of personal jurisdiction. Specifically, this court held that Yeo's signing of the insurance slip, on February 24, 2003, effectuated the agreement to insure a voyage, as described in the slip, from "Gulf Port in Mississippi ... to Alang, India." (Doc. 127 at 11). Plaintiff claims that it sought and did not receive coverage for a voyage policy from Mobile, Alabama, to Alang, India. (Doc. 155 at 8).

■ To recover, plaintiff must demonstrate that: (1) DSI failed to procure the policy to cover the voyage from Mobile, Alabama, to Alang, India; and (2) but for the failure, plaintiff would have had a good claim against underwriters under the policy. Plaintiff asserts claims for negligence and negligent misrepresentation under Alabama law. "Like any negligence claim, a claim in tort alleging a negligent failure of an insurance agent to fulfill a voluntary undertaking to procure insurance ... requires demonstration of the classic elements of negligence theory, i.e., (1) duty, (2) breach of duty, (3) proximate cause, and (4) injury." *Kanellis v. Pacific Indem. Co.*, 917 So.2d 149, 155 (Ala.Civ.App. 2005) (citation and internal quotations omitted).[4] For a negligent misrepresentation claim, Alabama law requires "(1) a misrepresentation (2) concerning a material fact (3) justifiably relied on by the plaintiff (4) and loss or damages proximately caused by such misrepresentation." *Indus. Partners, Ltd. v. CSX Transp., Inc.*, 974 F.2d 153, 157 (11th Cir.1992) (citing *Resolution Trust Corp. v. Mooney*, 592 So.2d 186, 188 (Ala.1991) (citing ALA. CODE § 6–5–101)). The court's substantive inquiry focuses upon whether DSI properly informed the insurer of the fact that the

M/V COPA CASINO departed on its voyage to Alang, India, from Mobile, Alabama, rather than Gulfport, Mississippi.

Plaintiff suggests that this court has already concluded that "the policy in question failed to cover the intended voyage." (Doc. 171 at 3). This court's March 30, 2006, ruling, however, is limited to the propriety of exercising personal jurisdiction over the underwriters and did not address what the subject contract ultimately covered. (Doc. 127). The jurisdictional issue before the court centered upon whether underwriters purposefully availed themselves of the privilege of doing business in Alabama. This court was, and remains, unaware of any authority under which constructive knowledge is adequate to satisfy the due process requirements of personal jurisdiction. Although constructive knowledge was not sufficient to show that underwriters "should reasonably anticipate being haled into court" in the state of Alabama, *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 474, 105 S.Ct. 2174, 85 L.Ed.2d 528 (1985), it may be sufficient to prove that DSI satisfied its duty to inform underwriters of the change in port of departure in view of the held covered clause within the policy before the court.[5]

The dispositive issue here is whether DSI acted reasonably in its effort to notify underwriters of the change in port of departure. The held covered provision under the "Change of voyage" heading of the contract at issue provides as follows:

2. Change of voyage

Held covered in case of deviation or change of voyage or any breach of warranty as to towage or salvage services,

---

4. There is no dispute that DSI served as plaintiff's agent.

5. Because constructive notice falls short of establishing purposeful availment, this court rejected any arguments arising from the held covered clause in the context of a personal jurisdiction analysis. (Doc. 127). To have determined that the held covered clause subjected underwriters to the personal jurisdiction of this court would mean that, even in the face of such attenuated contacts, underwriters could be haled into court in any state.

provided notice be given to the Underwriters immediately after receipt of advices and any amended terms of cover and any additional premium required by them be agreed.

(Doc. 53, Ex. M at 2). Here, underwriters' initialing of the insurance slip evidenced the existence of an insurance contract, but, pursuant to the held covered clause, did not necessarily establish the final terms of the policy. *See Cessna Aircraft Co. v. Hartford Accident & Indem. Co.*, 900 F.Supp. 1489, 1520, n. 41 (D.Kan.1995). "[T]he held covered clause in a marine insurance policy means that the vessel will be insured under the policy in the event of a breach of warranty as to trade or other matters, provided notice be given to the underwriters of such breach and an additional premium paid." *Seas Shipping Co. v. United States War Shipping Admin.*, 97 F.Supp. 129, 130 (S.D.N.Y.1951). The effect of a held-covered clause, therefore, is that the vessel remains covered if it breaches one of the warranties specified in the clause so long as the broker provides "immediate notice to the underwriters and payment of an additional premium, if required." ALEX L. PARKS, THE LAW AND PRACTICE OF MARINE INSURANCE AND AVERAGE 50 (1st ed.1987).

Plaintiff contends that DSI failed to comply with the notice requirements under the held covered clause. At trial, MIS Managing Director Richard Yeo testified that he received the final trip in tow survey and recommendations on March 3, 2003, which indicated that the voyage began at Mobile, Alabama; read it and determined that it was "okay." (Trial Tr. at 514). Gary Ferrazzano, manager of DSI's marine department, testified that he understood Yeo's confirmation to mean that scrap tow risk insurance was bound from

Mobile, Alabama, to Alang, India, based upon the final survey report. (Trial Tr. 620). Despite Yeo's testimony that usually the slip reflects where the vessel would depart, he admitted that "in ordinary terms the survey is conducted in the port of departure." (*Id.* at 519). Nonetheless, Yeo maintains that he did not actually notice that the vessel departed from Mobile until after the policy issued. (*Id.* at 538).

■ DSI submits that the underwriters possessed at least constructive knowledge of the change in port of departure by virtue of the trip in tow survey prepared by Franklin Skinner. (Pl.'s Ex. 23). The court agrees. Constructive knowledge is defined as "[k]nowledge that one using reasonable care or diligence should have, and therefore that is attributed by law to a given person." BLACK'S LAW DICTIONARY 876 (7th ed.1999). For example, in *St. Paul Fire & Marine Ins. Co. v. Christiansen Marine, Inc.*, 893 So.2d 1124 (Ala. 2004), an insurer based a denial of coverage on the grounds that the vessel at issue was unseaworthy. Unseaworthiness voids a policy of marine insurance *ab initio*, as seaworthiness is a prerequisite of cover. THOMAS J. SCHOENBAUM, ADMIRALTY AND MARITIME LAW § 19–16, at 337 (4th ed.2004). The Alabama Supreme Court held that since the insurer had possession of a condition and valuation survey prior to the tow voyage, which outlined problems with the vessel, the insurer "had knowledge—whether actual or constructive—of the condition of [the vessel] before the [ ] loss occurred." *St. Paul Fire*, 893 So.2d at 1134. In this case, underwriters possessed and accepted the Skinner survey; thus, by operation of the held covered clause, can be imputed with knowledge of the Mobile departure.[6]

---

**6.** Plaintiff's suggestion that since Yeo did not raise the premium, coverage could not be bound under the "held covered" is of no

avail. Yeo explained that "a tow from A to B overnight" for better cheaper facilities is distinct from "an ocean voyage" in terms of

██ In view of these facts and circumstances, plaintiff failed to demonstrate that DSI breached its duty of reasonable care to plaintiff to obtain tow risk coverage for the vessel on a voyage from Mobile to India. Accordingly, any claims for negligence or negligent misrepresentation based upon Ferrazzano's representations to plaintiff are due to fail. The court's analysis ends here.

## CONCLUSION

The court finds in favor of the defendants. Judgment will be entered by separate order.

**DONE and ORDERED.**

assessing risk. (Trial Tr. at 531–32). He added that he would not have done anything differently if he had known on February 28, 2003, around the time Yeo received the survey, that the vessel would depart from Mobile. (*Id.* at 532). It follows that the court cannot glean anything from Yeo's inaction. Likewise, plaintiff's argument that the risk never attached is without merit.