**MARITIMA PETROLEO E ENGENHARIA LTDA.,**
**Plaintiff,**

v.

**OCEAN RIG 1 AS and Ocean Rig 2 AS, Defendants.**

**No. 99 Civ. 8678(SAS).**

United States District Court, S.D. New York.

Oct. 6, 1999.

---

Samuel Feldman, Orloff, Lowenbach, Stifelman & Siegel, P.A., Roseland, NJ, Michael B. Kent, Kent, Beatty & Gordon, L.L.P., New York City, for Plaintiff.

Jack A. Greenbaum, Healy & Baillie, L.L.P., New York City, for Defendants.

### OPINION AND ORDER

SCHEINDLIN, District Judge.

Defendants, Ocean Rig 1 AS and Ocean Rig 2 AS (hereinafter "Ocean Rig" or "defendants"), move pursuant to Fed.R.Civ.P. Rules 12(b)(1) and (6) to dismiss the complaint and to vacate the maritime attachment brought by plaintiff Maritima Petroleo E Engenharia LTDA (hereinafter "Maritima" or "plaintiff") on the grounds that: (1) there is no admiralty jurisdiction; (2) the complaint fails to state a claim upon which relief can be granted; (3) plaintiff has abused the attachment process; and (4) plaintiff has no need for security. Because this Court lacks subject matter jurisdiction over plaintiff's claims, defendants' motion to dismiss the complaint and to vacate the attachment is granted.

## I. Background

On November 4, 1998, defendants, the owners of two Bingo deep sea oil drilling rigs, entered into a Memorandum Of Agreement ("MOA") with Maritima and two non-party Maritima affiliates, Formaritima Ltd. and Petrodrill Offshore, Inc. ("Formaritima" and "Petrodrill" respectively). *See* Complaint ("Compl.") ¶ 6; MOA attached to Complaint, Ex. A. The MOA contains a choice of law provision specifying that English law will govern any disputes and an arbitration clause. MOA ¶ 29. The MOA arose out of the following circumstances: Ocean Rig sought to secure drilling contracts for two rigs which were under construction. MOA ¶ B. Petrodrill had contracted with Petroleo Brasileiro S.A. ("Petrobras"), the Brazilian government's oil development agency, for the provision of six Amethyst oil rigs, but had experienced significant delays in the delivery of those rigs. MOA ¶¶ C & D. To remedy the situation, Petrobras and Petrodrill agreed to seek drilling rigs from third parties that were capable of fulfilling Petrobras' requirements. MOA ¶ E.

Accordingly, the MOA sets forth an agreement among Maritima, Ocean Rig, Petrodrill and Formaritima to seek drilling rig contracts for defendants' rigs with Petrobras for a period of between 12 and 18 months at a rate equal to the two highest rates that Petrobras would have paid for the Amethyst rigs. MOA ¶¶ 3 & 4. The MOA provided that once the contracts with Petrobras were procured, they would be governed by "new contracts". MOA ¶ 4. These new drilling contracts contemplated by the MOA would consist of a "Charter Contract" and a "Services Contract". MOA ¶ 16. Petrodrill agreed that it would sign each Charter Contract directly with Petrobras and then assign its rights and obligations under each Charter Contract to Ocean Rig. MOA ¶ 17. Similarly, Maritima agreed to sign each Services Contract with Petrobras and then

assign all rights and proceeds under each Services Contract to Ocean Rig. MOA ¶ 18.

Plaintiff alleges that after the MOA was signed, Ocean Rig threatened to negotiate with others for the chartering of its rigs. Compl. ¶ 8. To dissuade defendants from doing this, Maritima agreed to provide a standby Letter of Credit ("LOC Agreement"), for an LOC issued by Safra National Bank in the amount of $15 million. *See* LOC Agreement, November 18, 1999, Compl. Ex. B.

The purpose of the LOC was to secure Maritima's ability to procure the new contracts with Petrobras by 4:00 p.m. Brazilian time on February 5, 1999. Compl. ¶ 8; LOC Agreement ¶ 1.3. The parties agreed that if Maritima failed to procure the contracts by such time, Ocean Rig could present a demand letter and the LOC to Safra. Although it appeared to Maritima that its negotiations with Petrobras were likely to bear fruit, Maritima failed to secure the contracts for Ocean Rig by February 5, 1999.

Thereafter, Ocean Rig presented demand letters for payment to Safra. Citing certain discrepancies related to the conformity of the demand letters with the requirements of the LOC, Safra refused to honor the LOC. Compl. ¶ 13. Ocean Rig then sued Safra in this Court for wrongful dishonor and obtained a judgment directing Safra to pay the sum of the LOC. *See Ocean Rig ASA v. Safra Nat'l Bank of New York,* 72 F.Supp.2d 193, 204 (S.D.N.Y. 1999, *amended* July 14, 1999).

On the same day that the Court issued its order granting summary judgment to Ocean Rig, Ocean Rig issued a press release disclosing that there were substantial delays in the construction of its two Bingo rigs and that they would not be ready for delivery to Brazil until the first half of the year 2000. Compl. ¶ 15. Earlier, Ocean Rig had agreed in the MOA that construction on the two Bingo rigs would be completed by September 1999 and January 2000, MOA ¶ 8, and that it would be able to deliver the rigs to Brazil no later than November 30, 1999 and February 28, 2000. MOA ¶ 9.

On August 2, 1999, plaintiff filed its complaint in the instant action seeking an order to issue Process of Maritime Attachment and Garnishment pursuant to Fed. R.Civ.P. Supplemental Rule B and the Arbitration Act. 9 U.S.C. § 8. Plaintiff is also in the process of commencing an arbitration in London seeking, *inter alia,* recission of the MOA (and recissionary damages) arising out of Ocean Rig's allegedly fraudulent misrepresentations regarding the completion and delivery date of the rigs. Compl. ¶¶ 16 & 21. In addition, Maritima alleges that defendants breached their obligations under the MOA by calling on the LOC. Because Maritima was unable to procure either the Amethyst rigs or a substitute for Petrobras, Maritima is directly liable to Petrobras for liquidated damages and seeks compensation from Ocean Rig for these damages. Compl. ¶ 18. In total, Maritima seeks over $31 million in damages. For the purposes of securing Maritima's claims before the London arbitration, plaintiff obtained the order of maritime attachment over defendants' only identifiable asset in this district—Ocean Rig's $15 million judgement against Safra. Compl. ¶ 19; Order of Attachment, issued August 6, 1999, by United States District Judge Sidney H. Stein.

## II. Standard of Review

### A. Motion to Dismiss for Lack of Subject Matter Jurisdiction

When considering a motion to dismiss for lack of subject matter jurisdiction, a court must accept as true all material factual allegations in the complaint. *Atlantic Mut. Ins. Co. v. Balfour Maclaine Int'l Ltd.,* 968 F.2d 196, 198 (2d Cir.1992). The Court is not confined to the complaint, however. It may consider evidence outside the pleadings, such as affidavits. *See Antares Aircraft, L.P. v. Federal Republic of Nigeria,* 948 F.2d 90, 96 (2d Cir.1991), *vacated on other grounds,* 505 U.S. 1215,

112 S.Ct. 3020, 120 L.Ed.2d 892 (1992). In addition, "when the question to be considered is one involving the jurisdiction of a federal court, jurisdiction must be shown affirmatively, and that showing is not made by drawing from the pleadings inferences favorable to the party asserting it." *Shipping Financial Serv., Corp. v. Drakos*, 140 F.3d 129, 131 (2d Cir.1998).

### B. Procedure for Release From Attachment

■ Pursuant to Fed.R.Civ.P. Rule E(4)(f), defendants are entitled to "a prompt hearing at which the plaintiff shall be required to show why the arrest or attachment should not be vacated or other relief granted. . . ." Fed.R.Civ.P. E(4)(f). Thus, Maritima bears the burden of demonstrating why the attachment should not be vacated. The Order of Attachment was issued pursuant to the Federal Arbitration Act, 9 U.S.C. § 8, and Rule B(1) of the Supplemental Rules for Certain Admiralty and Maritime Claims. Rule B is invoked when a plaintiff files "a verified complaint *in personam* sufficient to make a *prima facie* showing that the plaintiff has a maritime claim against the defendant in the amount sued for and that the defendant is not present in the district." 2 Thomas J. Schoenbaum, *Admiralty and Maritime Law*, § 21–2 at 471 (2d ed.1999) (hereinafter *"Schoenbaum"*). Defendants are not present in the district. Therefore, the only issue is whether Maritima has properly alleged a maritime claim. The absence of maritime jurisdiction would prove fatal to plaintiff's attachment.

### III. Admiralty Jurisdiction

■ Admiralty jurisdiction is afforded under 28 U.S.C. § 1333(1) which grants district courts original jurisdiction over "[a]ny civil case of admiralty or maritime jurisdiction." [1] Without any further guidance, federal courts have been left to interpret the scope of maritime jurisdiction. Here, Maritima alleges that admiralty jurisdiction exists with regard to its breach of contract claim arising out of defendants' alleged breach of the MOA and its tort claim for defendants' alleged fraudulent misrepresentations.

### A. Admiralty Jurisdiction Over the Contract Claim

■ "The boundaries of admiralty jurisdiction over contracts—as opposed to torts or crimes—being conceptual rather than spatial, have always been difficult to draw." *Fednav, Ltd. v. Isoramar, S.A.*, 925 F.2d 599, 601 (2d Cir.1991) (citing *Kossick v. United Fruit Co.*, 365 U.S. 731, 735, 81 S.Ct. 886, 6 L.Ed.2d 56 (1961)). "[T]he trend in modern admiralty case law . . . is to focus the jurisdictional inquiry upon whether the nature of the transaction was maritime." *Exxon Corp. v. Central Gulf Lines, Inc.*, 500 U.S. 603, 611, 111 S.Ct. 2071, 114 L.Ed.2d 649 (1991). Thus, "a federal court must initially determine whether the subject matter of the dispute is so attenuated from the business of maritime commerce that it does not implicate the concerns underlying admiralty and

1. Although the Constitution provides for original jurisdiction over admiralty claims in federal court, *see* U.S. Const. art. III, § 2, cl. 1, such jurisdiction is not exclusive. *See American Dredging Co. v. Miller*, 510 U.S. 443, 446, 114 S.Ct. 981, 127 L.Ed.2d 285 (1994). It is well-established that a claim may be cognizable under both federal admiralty law and state law. *See, e.g., Dluhos v. Floating And Abandoned Vessel, Known As "New York"*, 162 F.3d 63, 70–71 (2d Cir.1998). Thus, a plaintiff has three choices as to how to bring an action cognizable under both federal admiralty law and state law: (1) bring an admiralty action in federal court; (2) bring an action in state court; or (3) bring a diversity action in federal court, assuming the additional requirements for diversity jurisdiction are met. *See id.*

Here, Maritima is a corporation organized under the laws of Brazil, and defendants are Norwegian companies. *See* Compl. ¶¶ 2–4. Diversity jurisdiction does not encompass suits brought by foreign plaintiffs against foreign defendants unless United States citizens are parties to the suit. *See* 28 U.S.C. § 1332(a)(3); 15 *Moore's Federal Practice* § 102.77 at 102–143 (3d ed.1999).

maritime jurisdiction." *Atlantic Mut. Ins. Co. v. Balfour Maclaine Int'l. Ltd.*, 968 F.2d 196, 200 (2d Cir.1992). Generally speaking, our Court of Appeals has recognized that if the subject matter of a contract "relates to a ship in its use as such, or to commerce or to navigation on navigable waters, or to transportation by sea or to maritime employment it is fairly said to constitute a maritime contract." *Fednav*, 925 F.2d at 601 (internal citations omitted). While a case-by-case analysis is required, a court may review previous cases to determine whether a particular agreement may be classified as a maritime contract. *See Kossick*, 365 U.S. at 735.

### 1. Characterizing the MOA

██ Defendants contend that the MOA is properly classified as a contract to procure drilling contracts; in other words, an agreement in which plaintiff, acting in the capacity of a charter broker, undertook to procure a contract with a third party. According to defendants, were the case characterized as such, it would fall under the preliminary contract exception to maritime jurisdiction requiring dismissal of plaintiff's claims. By contrast, plaintiff argues that the MOA is a "charter party" to furnish oil rigs which properly falls within admiralty jurisdiction as a maritime contract.[2]

#### a. The Preliminary Contract Doctrine

Historically, disputes arising out of a preliminary services contract do not invoke maritime jurisdiction. *See Shipping Financial Services Corp. v. Drakos*, 140 F.3d 129, 131 (2d Cir.1998) (collecting cases) (hereinafter *"Drakos"*).

A demarcation of ancient vintage, consistently recognized from the earliest days, is that agreements preliminary to a mar-

itime contract are not cognizable in admiralty. . . . Under this rationale neither an agreement to procure insurance, or crews, nor an undertaking to act as broker in securing cargo, or a charter party, have been cognizable in admiralty.

*Peralta Shipping Corp. v. Smith & Johnson Shipping Corp.*, 739 F.2d 798, 802 (2d Cir.1984) (internal citations omitted). The policy underlying this doctrine is that services that are preliminary to, as opposed to being a part of maritime contracts are too remote to be heard as maritime claims. *See Drakos*, 140 F.3d at 133 (citing *The Thames*, 10 F. 848 (S.D.N.Y.1881) ("The distinction between preliminary services leading to a maritime contract and such contracts themselves ha[s] been affirmed in this country from the first. . . .")). For example, general agency and sub-agency contracts for "shoreside" functions are traditionally non-maritime. *See* 1 *Schoenbaum* § 3–10 at 116. In addition, "[d]isputes involving preliminary agreements to make a charter party are not in admiralty." 1 *Schoenbaum* § 3–10 at 112 n. 18.

#### b. The Agency Contract Exception

Until 1998, the preliminary contract doctrine had been "fused" with the agency exception to admiralty jurisdiction. *See Cory Bros. & Co. v. U.S.*, 51 F.2d 1010, 1012 (2d Cir.1931); *Drakos*, 140 F.3d at 133. In *Drakos*, however, the Second Circuit considered the impact on the preliminary contract doctrine of the Supreme Court's decision in *Exxon Corp. v. Central Gulf Lines, Inc.*, 500 U.S. 603, 611, 111 S.Ct. 2071, 114 L.Ed.2d 649 (1991). *Exxon* held that agency contracts, which until that time had been *per se* excluded from the coverage of admiralty jurisdiction, could fall within admiralty jurisdiction if the subject matter or services to be performed under the contract are maritime in

---

**2.** A "charter party" is an arrangement whereby one party, the charterer, becomes entitled to the use of an entire vessel belonging to another. *See Great Circle Lines, Ltd. v. Matheson & Co. Ltd.*, 681 F.2d 121, 124 (2d Cir. 1982). As explained further below, the term "charter party" refers to the document in which the terms and conditions of the lease are set out. *Id.*

nature. *See Exxon*, 500 U.S. at 612, 111 S.Ct. 2071. Exxon supplied fuel to defendant's vessel. When defendant failed to pay its bill, Exxon brought suit in federal court. Finding that Exxon had not directly supplied fuel to the vessel, but rather had acted as an agent for the vessel by procuring the fuel from another supplier, the district court refused to exercise admiralty jurisdiction over Exxon's action. The Second Circuit affirmed, but the Supreme Court reversed, holding that while Exxon acted as an agent for the vessel owner in obtaining fuel from other sellers, the agency agreement was maritime in nature. Rather than apply a *per se* exclusion rule to all agency contracts, *Exxon* proposed that lower courts "look to the subject matter of the agency contract and determine whether the services performed under the contract are maritime in nature." *Exxon*, 500 U.S. at 612, 111 S.Ct. 2071. The subject matter of the contract in *Exxon* was "the value of the fuel received by the ship", and it should not make a difference in terms of maritime jurisdiction whether Exxon supplied that fuel to the vessel directly, or through another seller. *See id.* at 612, 111 S.Ct. 2071. In overturning the bright-line rule of *Minturn v. Maynard*, 58 U.S. 477, 17 How. 477, 15 L.Ed. 235 (1854), that agency contracts merited *per se* exclusion from admiralty jurisdiction, the Supreme Court emphasized that its ruling was "a narrow one". It also explicitly noted that it offered no guidance with respect to the preliminary contract doctrine. *Exxon*, 500 U.S. at 612, 613 n. 7, 111 S.Ct. 2071.[3]

■ Nevertheless, *Exxon* forced the Second Circuit to "disentangle" its prior fusion of the preliminary contract doctrine and the *per se* agency contract exception to maritime jurisdiction and to consider "the possibility that while agency contracts are not a *per se* exception to admiralty

jurisdiction, preliminary contracts may still be an exception to such jurisdiction." *Drakos*, 140 F.3d at 133. In *Drakos*, defendants signed a twelve-year charter party to charter a vessel. *See id.* at 130. Finding various difficulties in the operation of the vessel, defendants sought assistance from plaintiff, a ship brokerage outfit, to find a subcharterer for the remaining years of the contract. With defendants' authorization, plaintiff contacted OMI Petrolink ("OMI") which expressed an interest in the arrangement. After OMI backed out, plaintiff continued to explore other subchartering options. Subsequently, defendants entered into a subcharter with OMI through OMI's broker, causing plaintiff to lose its anticipated brokerage commission. *Id.* at 131. Plaintiff filed a breach of contract suit in federal court asserting maritime jurisdiction. Without deciding whether *Exxon* had eliminated the *per se* exception for preliminary contracts, the Second Circuit ruled that the brokerage contract to procure a subcharter was non-maritime under both the preliminary contract doctrine and an analysis of the nature and subject matter of the contract. *Id.* at 133–34.

### c. Charter Contracts

Plaintiff argues that the essence of the MOA obligated defendants to furnish oil drilling rigs pursuant to the drilling contracts that plaintiff agreed to obtain from Petrobras. As such, plaintiff compares the MOA to a charter party the subject of which is the furnishing of rigs for offshore oil exploration. A "charter" is an arrangement whereby one person (the "charterer") becomes entitled to the use of an entire vessel (here, the rigs) belonging to another (the "owner"). A "charter party" is the agreement in which the terms and conditions of the lease of the vessel by the owner to the charterer are set out. *See* 2 *Schoenbaum* § 11–1 at 169.

---

**3.** The conclusion to be drawn from both *Drakos* and *Exxon* is that neither the Supreme Court nor the Second Circuit has ruled on the continuing validity of the preliminary con-

tract doctrine. Nevertheless, both courts emphasize that courts should focus on the nature of the services performed under the contract.

Relying on a string of Fifth Circuit cases recognizing that an oil drilling rig is a "vessel" and that a contract to furnish rigs for offshore drilling services is maritime in nature, plaintiff postulates that the MOA is a maritime contract. *See, e.g., Lewis v. Glendel Drilling Co.*, 898 F.2d 1083 (5th Cir.1990) (admiralty jurisdiction existed where lease operator and owner of offshore drilling rig brought indemnity claim against driller with respect to drowning of employee); *Trico Marine Operations, Inc. v. Falcon Drilling Co.*, 95 Civ. 0381, 1996 WL 96883, *2 (E.D.La. March 1, 1996), *aff'd*, 116 F.3d 159 (5th Cir.1997) (drilling contract for offshore oil exploration was maritime in nature). Assuming, arguendo, that the Second Circuit would agree that a contract involving the use of a drilling rig is maritime in nature, this does not address the question of whether a contract to *procure* a drilling charter also falls within the Court's admiralty jurisdiction.

### 2. Analysis of the MOA

#### a. The MOA Is Not A Maritime Contract

As discussed above, the general rule regarding maritime contracts is that "the subject matter of the contract must be directly and intimately related to the operation of a vessel and navigation; it is not enough that the contract relate in some preliminary (shoreside) manner to maritime affairs." 1 *Schoenbaum* § 3–10 at 111; *see also Fednav*, 925 F.2d at 599 (agreement to act as surety for another's breach of a charter party is non-maritime); *Habans v. Johnny Glover*, 89 Civ. 2761, 1992 WL 125372, *5 (E.D. La. May 15, 1992) (maritime law not applicable to contract to procure fishing boat where defendant boat charter purportedly acted as agent or broker).

Here, the MOA is not a contract to provide offshore drilling rigs. It is an agreement to *procure* contracts for the future use of defendants' rigs. While Maritima's incentive to enter the MOA differs from a broker's desire for a commission, Maritima's services here were identical to those of the broker in *Drakos, i.e.* land-based negotiations with Petrobras regarding the terms of the potential charter. *See* p. 168, *supra.*

Maritima's characterization of the MOA as a contract for the use of oil rigs is erroneous, as it was not a foregone conclusion that Petrobras would contract for the use of defendants' rigs. Even the LOC construes the MOA as an agreement under which "Petrodrill shall *seek to secure* drilling contracts." LOC ¶ C (emphasis added). It continues: "Maritima has offered to procure that [Ocean Rig] be provided with an irrevocable standby letter of credit in the amount of US$15,000,000 as security for Maritima and Petrodrill *actually being able to secure* Drilling Contracts for both Rigs within eleven (11) weeks...." LOC ¶ D (emphasis added). The LOC expressly contemplated plaintiff's failure in securing the contracts. "The Parties agree that [Ocean Rig] shall be entitled to make a demand for immediate payment under the LOC if Petrodrill and Maritima *shall have failed to obtain* one Drilling Contract with Petrobras for each of the Rigs...." LOC ¶ 1.3 (emphasis added).

In addition, in January 1999, Maritima received a letter from Petrobras stating: "We wish to make clear that any *future substitution* of the Amethyst series probes ... shall be formalized by addendum to the respective contracts, and all the other contractual clauses shall remain unaltered." Petrobras Letter to Maritima, January 19, 1999, attached to the Declaration of Christian Huseby, President of Ocean Rig, August 19, 1999 ("Huseby Decl."), Ex. 4 (emphasis added).[4] In fact,

---

**4.** Maritima objects to defendants' translation of this letter. Under Maritima's preferred translation, the letter refers to the "eventual",

rather than the "future" substitution of the rigs. In any event, the letter makes clear that Maritima had yet to procure the drilling con-

in early January 1999, contrary to the conditions of the MOA, Maritima informed Ocean Rig that Petrobras would not substitute defendants' rigs for the higher-rate Amethysts, but might substitute them for two of the lower-paying Amethysts. *See* Huseby Decl. ¶ 8, Exs. 3–7 (exchange of correspondence regarding failed negotiations for Ocean Rig to accept lower rates with Maritima making up shortfall).

Plaintiff notes that the MOA was quite detailed. It provided terms and conditions for the intended charter, such as: dates and location for delivery (¶ 9); the charter period (¶ 3); technical specifications upon delivery (¶¶ 10 & 11); and responsibilities for crewing and insurance (¶¶ 24, 31). Nevertheless, the MOA merely set the stage and conditions for plaintiff's land-based negotiations with Petrobras. As plaintiff itself acknowledged, "[a]n agreement which merely sets the stage and conditions for the possible opening of land-based negotiations" is not maritime. Plaintiff's Memorandum of Law in Opposition to Defendants' Motion to Dismiss ("Pl.s' Mem.") at 11 (quoting *Carter–Green–Redd Inc. v. USS Cabot/Dedalo Museum Foundation*, 756 F.Supp. 276, 278 (E.D.La.1991)). The MOA is simply not a contract for the deployment of oil rigs. It is an agreement to procure a contract for oil rigs and is therefore too far removed from navigation or maritime commerce to justify the exercise of federal maritime jurisdiction.

### b. Mixed Contracts

▮ Even assuming that the MOA could be considered a maritime contract to furnish rigs, it would be, at the very least, a "mixed" rather than a unified contract. When assessing admiralty contract jurisdiction, "[t]he general rule is that admiralty jurisdiction arises only when the subject-matter of the contract is 'purely' or 'wholly maritime in nature.'" *Transat-*

lantic Marine Claims Agency Inc. v. Ace Shipping Corp.*, 109 F.3d 105, 109 (2d Cir. 1997) (citing *Rea v. the Eclipse*, 135 U.S. 599, 608, 10 S.Ct. 873, 34 L.Ed. 269 (1890)). A "mixed" contract, *i.e.*, a contract that contains both admiralty and non-admiralty obligations is, therefore, usually not within admiralty jurisdiction. *See Atlantic Mutual*, 968 F.2d at 199.

There are two exceptions to this general rule. First, in a contract containing both maritime and non-maritime elements, a claim under a maritime portion of a contract will sustain admiralty jurisdiction where the maritime obligations can be "separately enforced without prejudice to the rest." *Compagnie Francaise De Navigation a Vapeur v. Bonnasse*, 19 F.2d 777, 779 (2d Cir.1927) (L.Hand, J.); *see, e.g., Vera, Inc. v. The Tug "Dakota"*, 769 F.Supp. 451 (E.D.N.Y.1991) (joint venture agreement for repair and operation of vessel inseparable from non-maritime portion of agreement for sale of vessel, defeating maritime jurisdiction); Second, where the non-maritime elements are merely "incidental" in an otherwise maritime contract, admiralty jurisdiction will encompass the entire contract. *See, e.g., Kuehne & Nagel v. Geosource, Inc.*, 874 F.2d 283, 290 (5th Cir.1989) (where contract involved transport of goods over both land and sea and plaintiffs sought damages for breach of both land and sea portions of contract, land-based operations not merely incidental to contract thereby defeating admiralty jurisdiction).

Here, the non-maritime elements of the MOA are not merely "incidental" to the contract. The essence of the MOA is Maritima's obligation to procure contracts through land-based negotiations with Petrobras. Incidental to that obligation is the maritime obligation to furnish the rigs. The obligation to furnish the rigs is not severable from, but rather dependent upon Maritima's fulfilment of its non-maritime

tracts from Petrobras. *See* Declaration of German Efromovich, Maritima President,

September 1, 1999, ¶ 15 & Ex. E.

obligation to successfully negotiate a contract with Petrobras. If Maritima failed to perform under the MOA, defendants would have no obligation to furnish the rigs. Thus, even if the MOA were a mixed contract, it would still not warrant the exercise of admiralty jurisdiction because the bulk of the agreement concerns a non-maritime matter (future contract negotiations) and the maritime portion of the MOA (furnishing rigs) is entirely dependent upon the non-maritime matter. Therefore, Maritima's claim for breach of contract does not fall within the court's admiralty jurisdiction.

## B. Admiralty Jurisdiction Over The Misrepresentation Claim

Admiralty tort jurisdiction is determined quite differently from admiralty contract jurisdiction. *See Sirius Ins. Co. (UK) Ltd. v. Collins*, 16 F.3d 34, 37 (2d Cir.1994). The Supreme Court, in *Foremost Ins. Co. v. Richardson*, 457 U.S. 668, 673–74, 102 S.Ct. 2654, 73 L.Ed.2d 300 (1982), and again in *Sisson v. Ruby*, 497 U.S. 358, 364, 110 S.Ct. 2892, 111 L.Ed.2d 292 (1990), has emphasized that all admiralty torts must have a "substantial relationship" to traditional maritime activity. An important—although not necessarily determinative—consideration in ascertaining whether such a "substantial relationship" exists is whether the tort occurred on navigable waters. *See Jerome B. Grubart, Inc. v. Great Lakes Dredge & Dock Co.*, 513 U.S. 527, 115 S.Ct. 1043, 130 L.Ed.2d 1024 (1995); *see also* 1 *Schoenbaum* § 3–5 at 78 (the test for admiralty tort jurisdiction "requires that an incident (1) occur on navigable waters; (2) bear a substantial relationship to traditional maritime activity; and (3) have a potential impact on maritime commerce"). Intentional torts, such as fraud, misrepresentation and fraudulent inducement to contract "must have an effect on navigable waters to be within admiralty jurisdiction." 1 *Schoenbaum* § 3–5 at 79.

In the leading case in this area, *Kuehne & Nagel v. Geosource, Inc.*, *supra*, the Fifth Circuit held that a freight forwarder's fraudulent misrepresentation claim against a carrier's parent was not within maritime jurisdiction. There, plaintiff alleged that Geosource fraudulently induced Kuehne & Nagel to contract with Geosource's alter-ego, Ucamar, for the shipment of cargo without revealing that Ucamar had been experiencing serious operational and financial problems. *See id.* ___ at 285–86. Concluding that plaintiff had alleged a maritime tort, the district court tried the case, resulting in a verdict and damages for plaintiff. *Id.* at 286. The Fifth Circuit reversed, holding that a party to a contract with strong maritime implications must satisfy the situs requirement when seeking to predicate jurisdiction on a maritime tort, and inducement to enter a contract with maritime consequences does not bestow admiralty jurisdiction unless the situs requirement is met.

> Geosource's alleged misrepresentations to [Kuehne & Nagel] that induced [Kuehne & Nagel] to enter the contracts were made at a Geosource-sponsored meeting at a hotel in Hamburg, West Germany. Thus, the tortious acts occurred before Kuehne & Nagel signed the contract. The misrepresentations had their desired "effect" on land when they prompted Kuehne & Nagel to sign the contracts of affreightment. Kuehne & Nagel's injury resulted from Ucamar's failure to deliver the cargo to its destination.... At best, the injury, if any, that occurred on navigable water was too remote from the tortious act to meet the situs requirement for admiralty jurisdiction.

*Id.* at 289.

Maritima argues that the effect of defendants' allegedly wrongful conduct was "felt in the failure to have the Rigs in place at sea and operating at the times required by the MOA...." Pl.'s Mem. at 17. Nevertheless, any misrepresentations

which occurred most certainly occurred on land when the parties executed the MOA. Moreover, plaintiff cannot rely on the theory that while the misrepresentation took place on land, it "took effect" upon the navigable waters. Because Maritima was unable to finalize an agreement with Petrobras for the provision of the Bingo rigs, any misrepresentation made by Ocean Rig regarding the delivery date of those rigs could not have had an effect at sea.[5] Defendants' alleged misrepresentation took effect immediately on land when the representation made by Ocean Rig caused plaintiff to enter into the MOA. Thus, the tortious act occurred when the MOA was signed. *See Kuehne & Nagel*, 874 F.2d at 289. Because torts fall within maritime jurisdiction only if they occur or have effects on navigable water, and there is no evidence that any element of the alleged fraud was committed anywhere close to navigable water, or had any effect on water, plaintiff's tort claim is dismissed for lack of maritime jurisdiction.

## IV. Conclusion

For the foregoing reasons, this Court lacks admiralty jurisdiction over plaintiff's claims. Because of the absence of subject matter jurisdiction, I shall not address defendants' other grounds for their motion to dismiss. Plaintiff's complaint is dismissed, and the maritime attachment is vacated. The Clerk of the Court is directed to close this case.

---

5. Any effect on the navigable waters, such as a drilling delay, would have been caused by Petrodrill's own failure to provide Petrobras with its Amethyst rigs.