**SEA TRANSPORT CONTRACTORS, LTD., Plaintiff,**

v.

**INDUSTRIES CHEMIQUES DU SENEGAL, Defendant.**

**No. 05 Civ. 10271(RCC).**

United States District Court, S.D. New York.

Jan. 24, 2006.

---

388

Owen Francis Duffy, III, Fowler, Rodriguez & Chalos, Port Washington, NY, for plaintiff.

Gina Maria Venezia, Freehill, Hogan & Mahar, LLP, New York, NY, for defendant.

## MEMORANDUM & ORDER

CASEY, District Judge.

On December 7, pursuant to a verified complaint, Plaintiff Sea Transport Contractors, Ltd., ("STC") procured a Rule B maritime attachment as security for two breach of contract claims it brought against Defendant Industries Chemiques du Senegal ("ICS") in London. On December 30, 2005, ICS sought and received an order to show cause why the Rule B attachment obtained by STC should not be vacated or modified. ICS claims that (1) it is protected from prejudgment attachment under the Foreign Sovereign Immunities Act; (2) the contract listed in Plaintiff's second cause of action is not a maritime contract and thus the attachment should be vacated for want of admiralty jurisdiction; (3) Rule B attachments should not be used in aid of foreign litigation; (4) the Court, if it rules against ICS on the first three arguments, should reduce the amount awarded in the attachment; and (5) the Court should award it counter security for the claims litigated abroad. For the following reasons the Court holds that (1) ICS is not immune under the Foreign Sovereign Immunities Act; (2) the disputed contract is a maritime contract subject to Rule B attachment; (3) Rule B attachments can be used in aid of foreign litigation; (4) the attachment should be reduced to $5,218,109.38.; and (5) that no counter security is warranted. As such, ICS's motion to vacate the Rule B attachment is **DENIED**, the application to modify the amount of the attachment is **GRANTED**, and the application for counter security is **DENIED**.

## I. BACKGROUND

STC is a Liberian company that is registered in Greece pursuant to Greek law and self-described by the President of its Board of Directors as "established . . . in 1997 with the specific objective of entering/taking shipping Contracts of Affreightment ('COAs') and shipping individual cargoes." (Duffy Aff. Ex. A ¶ 5 (Raissis Decl.)). ICS is a corporation organized under the laws of Senegal with its principal place of business in Senegal. It is a manufacturing entity involved in the importation of raw materials and production and export of phosphoric acid and fertilizer. (Order to Show Cause Ex. 2 ¶ ¶ 7, 12 (N'Diaye Decl.)) ICS claims that 65% of ICS is owned by state entities in the following proportions: Senegal, 46.38%; India, 6.97%; Ivory Coast 4.27%; Nigeria,

3.95%; Cameroon 3.35%. (*Id.* Ex. 3 ¶ 4 (Diop Decl.)). The Board of Directors of ICS contains representatives from various agencies of each of the above countries. (*Id.* ¶ 7.) The second largest investor in ICS is a private company, IFFCO, with 19.09%; there are 17 other private investing shareholders. (*Id.* Ex. 3A.) ICS is the "product of ... the convergence between India's significant need for phosphoric acid to produce fertilizer, and the availability of a high quality phosphate mine in Senegal," and took its current form in 1996 after the merger of Compagnie Sénégalaise des Phosphates de TAIBA and ICS. (Duffy Aff. Ex. B (printout of ICS website).)

Pursuant to a verified complaint filed in the Southern District of New York on December 7, 2005, STC applied for and received an order of maritime attachment and garnishment against ICS under Rule B of the Supplemental Admiralty Rules. The Order, signed by Judge Batts, allowed restraint of over $75 million to secure recovery of current and estimated future damages resulting from ICS's alleged breach of two contracts-an arbitration and a litigation-currently pending in London, England. STC claims the security is needed because ICS faces serious financial difficulty. (Pl.'s Opp'n 1.) ICS claims the attachment is merely a mechanism to force a hasty settlement. (Def.'s Mem. 3.) STC successfully restrained about $15 million by seizing two electronic fund transfers as the assets passed through the Southern District of New York.

The first contract is dated February 4, 2005 and is the subject of STC's first cause of action. Both parties acknowledge it is typical charter party contract of affreightment and thus subject to admiralty rules and procedures. This contract is currently in arbitration in London and STC claims the breach of this contract resulted in $218,109.38 in damages.

There is significant dispute over the second contract, titled "Contract of Exclusive Cooperation," dated April 6, 2005 and which is the subject matter of STC's second cause of action. (*See* (Duffy Aff. Ex. E.)(hereinafter "Cooperation Contract").) ICS challenges the validity of the Cooperation Contract as a maritime contract. The Cooperation Contract, selectively cited to by both parties, states in part:

Whereas [ICS] is currently importing 650,000 MT of Bulk Sulphur, 40–50,000 MT of Anhydrous Ammonia, 30–40,000 MT of Ammonium Sulphate, 50,000 MT of Bulk Potash and 30–40,000 MT of Bulk Urea ...;

Whereas ICS is aiming to export about 300,000 MT of, inter alia, Diammonium Phosphate and Double Super Phosphate to various destinations;

Whereas to achieve successful results ICS needs to have a shipping management function for its imports and exports.

Whereas Sea Transport Contractors Ltd. of 80 Broad Street, Monrovia, Liberia, hereinafter referred to as "STC", is a shipping company managing freight.

Whereas STC has the capability to serve ICS' shipping management function to achieve better planning of its imports and exports in terms of shipping while economizing on freight and minimizing its risk and the Parties have hereby agreed that STC will perform such function subject to the terms herein stated and agreed.

. . . . .

1) ICS has agreed to appoint STC as agent and the exclusive handler of the sea transportation (shipping management function) of all its imports and exports....;

. . . . .

3) STC will appear as the Charterer on all business conducted/Charter Parties entered into with third parties always acting as agent on behalf and to the best interest of ICS;

4) STC will have the complete liberty to negotiate and agree Charter Party terms with relevant third parties . . . ;

5) STC will have the complete liberty to negotiate the freight rates . . . ;

6) STC is hereby authorized to sign Charter Parties with third parties in its own name. It is expressly agreed that the terms and conditions, liberties and exceptions of these Charter Parties will be binding upon ICS and STC as fully as if a back-to-back Charter Party had been signed between ICS and STC. . . . STC will produce a Charter Party between ICS and STC for each and every relevant shipment . . . ;

7) ICS undertakes and agrees . . . to immediately pay to STC freight, deadfreight, demurrage, detention and any other sums that may from time to time become due in accordance with Charter Party terms and conditions, thus enabling STC to perform its obligations vis-a-vis the various third parties;

. . . . .

9) STC will have a Charterers' Liability Insurance (P & I Club) in place covering all risks, including damages to hull;

10) STC will not be charging Management Fees but will make its profit directly from the business conducted by way of a freight differential of a minimum US$ 1 per mt charged to ICS, the exact figure to be determined by the parties on a voyage to voyage basis. . . . ;

. . . . .

13) STC will organise the quality and quantity/weight inspection of all cargoes imported to and exported from Senegal . . . ;

14) STC undertakes to arrange the training of an officer of ICS . . . ;

(Cooperation Contract at 1–4.) The Cooperation Contract is currently the subject of litigation in London, and STC alleges that it will suffer a loss of $75 million based on the contract continuing for a period of 30 years. (Compl. ¶¶ 20–21.)

Pursuant to Supplemental Admiralty Rule E(2)(f), ICS sought and received on December 30, 2005 an order to show cause why the Rule B Attachment should not be vacated or modified. The Court held the requested hearing on January 5, 2006.

## II. DISCUSSION

### A. Standard of Review

■ To satisfy the conditions of Rule B, a plaintiff must make a prima facie showing that there exists a maritime claim against the defendant in the amount sued for and that the defendant is not present in the district. Supp. R. Fed.R.Civ.P. § B. Thereafter, Rule E(4)(f) provides that any person claiming an interest in the attached property is "entitled to a prompt hearing at which the plaintiff shall be required to show why the . . . attachment should not be vacated or other relief granted consistent with these rules." *Id.* at E(4)(f); *Eitzen Sealift A/S v. Cementos Andinos Dominicanos, SA,* No. 05 Civ. 4550(DC), 2005 WL 2218025, at *2 (S.D.N.Y. Sept.9, 2005). The plaintiff, thus, has the burden to show that the attachment should not be vacated, *Allied Maritime, Inc. v. Rice Corp.,* No. 04 Civ. 7029(SAS), 2004 WL 2284389, at *2 (S.D.N.Y. Oct.12, 2004); *Royal Swan Navigation Co. v. Global Container Lines,* 868 F.Supp. 599, 604–05 (S.D.N.Y.1994), and at the hearing the defendant can attack " 'the complaint, the arrest, the security demanded, or any other alleged deficiency in the proceedings,' " *Aqua Stoli Shipping Ltd. v. Gardner Smith Pty Ltd.,* 384 F.Supp.2d

726 (S.D.N.Y.2005) (quoting Supp. R. Fed. R.Civ.P. E advisory committee's note).

▮ Finally, a district court has the inherent authority to vacate an attachment "upon a showing of 'any improper practice' or a 'manifest want of equity on the part of plaintiff.'" *Blake Maritime, Inc. v. Petrom S.A.*, No. 05 Civ. 8033, 2005 WL 2875335, at *2 (S.D.N.Y. Oct. 31, 2005) (quoting Southern District of New York Former Local Civil Rule 12 (1986)). The Second Circuit has held that "[t]he inherent power to adapt an admiralty rule to the equities of a particular situation is entrusted to the sound discretion of the district judge." *Greenwich Marine, Inc. v. S.S. Alexandra*, 339 F.2d 901, 905 (2d Cir.1965).

### B. Analysis

ICS attacks the validity of the complaint and the attachment arguing (1) that no prejudgment attachment (under either contract) is allowed under the Foreign Sovereign Immunities Act ("FSIA"); (2) that the Cooperation Contract is not a maritime contract and thus the attachment should be vacated for want of admiralty jurisdiction; and (3) that Rule B attachments should not be used in aid of foreign litigation. ICS further argues that, if the Court rules against it on the first three arguments, the Court should reduce the amount awarded in the attachment. In addition, ICS seeks counter security for the claims litigated abroad.

### 1. Foreign Sovereign Immunities Act

▮ The FSIA provides the "sole basis" for obtaining jurisdiction over a foreign sovereign in the United States and commands that a "foreign state shall be immune from the jurisdiction of the courts of the United States" unless one of several expressly defined exceptions applies. *Republic of Argentina v. Weltover*, 504 U.S. 607, 610–11, 112 S.Ct. 2160, 119 L.Ed.2d

394 (1992). To be immune under the FSIA, a defendant must present a prima facie case that it is a foreign sovereign, or an agent or instrumentality of a foreign sovereign, and thereafter the burden switches to the plaintiff to demonstrate that an FSIA exception applies. *Cargill Int'l S.A. v. M/T Pavel Dybenko*, 991 F.2d 1012, 1016 (2d Cir.1993). Absent an explicit waiver of immunity, a foreign state is immune from prejudgment attachment of its assets used for commercial activity in the United States. *See* 28 U.S.C. § 1610(d); *Banco de Seguros del Estado v. Mutual Marine Office, Inc.*, 344 F.3d 255, 261 (2d Cir.2003).

▮ ICS does not argue that it is a "foreign state," but rather that it is an "agency or instrumentality of a foreign state," which includes any entity:

> (1) which is a separate legal person, corporate or otherwise, and

> (2) which is an organ of a foreign state or political subdivision thereof, or a majority of whose shares or other ownership interest is owned by a foreign state or political subdivision thereof, and

> (3) which is neither a citizen of a State of the United States ... nor created under the laws of any third country.

28 U.S.C. § 1603(b)(1)-(3). ICS's satisfaction of the requirements of the first and third subsections is not in dispute, but significant controversy arises as to the second subsection. ICS claims that when the minority ownership interests of Senegal, India, Ivory Coast, Nigeria, and Cameroon are "pooled," 65% of ICS's shares are owned by foreign states and thus satisfy the requirements of the second subsection. STC challenges the legal and factual accuracy of such a claim.

When a court looks to whether "pooling" shares satisfies the FSIA, it seeks "sufficient indicia that sovereign states are jointly acting in their sovereign capacities through the entity and that the entity should therefore qualify as a sovereign state." *Gardiner Stone Hunter Int'l v. Iberia Lineas Aereas De Espana, S.A.*, 896 F.Supp. 125, 131 (S.D.N.Y.1995). Sufficient indicia have been found to exist where the corporation was wholly owned (100) by foreign states and where the corporation was created by international agreement. *See, e.g., In re Air Crash Disaster Near Roselawn, Ind. on Oct. 31, 1994,* 96 F.3d 932, 939 (7th Cir.1996) (pooling the ownership interests of two foreign sovereigns under the FSIA because all of the corporation's shares were owned by France and Italy and because the corporation at issue was a "multinational joint venture" and "not merely an investment in a private commercial enterprise as a 'joint risk-taker,'"); *Mangattu v. M/V Ibn Hayyan,* 35 F.3d 205, 208 (5th Cir.1994) ("We hold that an entity 100% owned by foreign states, created by an agreement of all the participating states, satisfies the requirements of § 1603(b)(2)."); *Gardiner Stone,* 896 F.Supp. at 131 (disallowing pooling because the corporation in question was not created by treaty or multinational joint venture); *LeDonne v. Gulf Air, Inc.,* 700 F.Supp. 1400, 1405–06 (E.D.Va. 1988) (holding that a corporation established by a treaty and equally co-owned by four nations was a "foreign state" under § 1603 even though no single foreign state owned a majority of its shares).[1]

Sufficient facts to justify pooling are not present here. Not only is state ownership in ICS only 65%, ICS in its current form was created by a merger/takeover, not by international agreement or joint venture. (*See* Duffy Aff. Ex. B (printout of ICS website).) Absent (at least) such an agreement, there are no "sufficient indicia" that the state shareholders of ICS are operating in their sovereign capacities, *Gardiner Stone,* 896 F.Supp. at 131, and the state shareholders appear to be only "joint risk-takers," *In re Air Crash Disaster,* 96 F.3d at 939. As such, ICS fails to make a prima facie case that it is an agency or instrumentality of a foreign sovereign state under § 1603(b)(2), and thus its claim to immunity under the FSIA fails.

### 2. Admiralty Jurisdiction under the Cooperation Contract

ICS claims that the Cooperation Contract is not a maritime contract, and thus not within the Court's admiralty jurisdiction characterizing the Cooperation Contract as a "garden variety charter brokerage agreement" a "contract to procure a charter party," and "preliminary in nature." (Def.'s Mem. 10, 14). Lack of maritime jurisdiction renders a Rule B attachment void. *See Maritima Petroleo E. Engenharia LTDA. v. Ocean Rig 2 AS,* 78 F.Supp.2d 162, 166 (S.D.N.Y.1999). STC argues that the Cooperation Contract is maritime in nature, characterizing the contract as a "long term contract of affreightment." (Pl.'s Opp'n 5.)

Admiralty jurisdiction is afforded this Court under 28 U.S.C. § 1333(1), which provides for original jurisdiction in "[a]ny civil case of admiralty or maritime jurisdiction." Traditionally, a maritime contract

---

**1.** ICS cites cases where the § 1603(b)(2) issue was resolved without objection or on consent of the parties. *See Concesionaria DHM, S.A. v. International Finance Corp.,* 307 F.Supp.2d 553, 556 (S.D.N.Y.2004); *Moses v. Air Afrique,* 2000 WL 306853, *1 (E.D.N.Y.2000). In addition, in *Concesionaria,* there was undisputed evidence that the corporation was created by an agreement of its member countries, whereas in *Moses* that mode of creation was not addressed. For these reasons, the Court finds these cases less instructive than those cited above in the text.

is one that "relates to a ship in its use as such, or to commerce or to navigation on navigable waters, or to transportation by sea or to maritime employment." *Stolt–Nielsen SA v. Celanese AG*, 430 F.3d 567, 572 (2d Cir.2005) (alterations and quotation marks omitted). In *Exxon Corp. v. Central Gulf Lines, Inc.*, 500 U.S. 603, 111 S.Ct. 2071, 114 L.Ed.2d 649 (1991), the Supreme Court gave the modern rule for determining admiralty jurisdiction in a contracts case. Overruling *Minturn v. Maynard*, 58 U.S. 477, 17 How. 477, 15 L.Ed. 235 (1854), and dispensing with the *per se* rule excluding agency contracts from admiralty, the Court held that the "true criterion" and "crucial consideration" for determining admiralty jurisdiction is the "nature and subject matter of the contract at issue." *Exxon*, 500 U.S. at 610–11, 111 S.Ct. 2071. The Court also reiterated that the "fundamental interest giving rise to maritime jurisdiction is the protection of maritime commerce." *Id.* at 608, 111 S.Ct. 2071 (internal quotation marks omitted). It has thus been recognized that "a federal court must initially determine whether the subject matter of the dispute is so attenuated from the business of maritime commerce that it does not implicate the concerns underlying admiralty and maritime jurisdiction." *Atlantic Mut. Ins. Co. v. Balfour Maclaine Int'l Ltd.*, 968 F.2d 196, 200 (2d Cir.1992).

When the Second Circuit recognized the *Exxon* standard in *Shipping Financial Services Corp. v. Drakos*, 140 F.3d 129, 132 (2d Cir.1998), the court noted, without deciding the issue, the possible perseverance of the Circuit's "preliminary contract doctrine," a *per se* rule that "disputes arising out of preliminary services contracts do not invoke maritime jurisdiction." The policy behind the rule is that services that are preliminary to a maritime contract are too remote to be heard as maritime claims. *See id.* at 133; *Maritima Petroleo*, 78 F.Supp.2d at 167 (applying the doctrine

post-*Exxon*). Typically, charter-brokerage agreements are considered preliminary and, as such, not maritime contracts. *See Drakos*, 140 F.3d at 133 (noting that the preliminary contract doctrine has been applied "somewhat mechanically to brokerage agreements involving ship charters"). Because the Court finds that the Cooperation Contract is a maritime contract under *Exxon* and not preliminary in nature, it need not decide whether the preliminary contract doctrine remains in effect.

### a. *Exxon's* Nature and Subject Matter Analysis

Under the *Exxon* test, the Cooperation Contract is a maritime contract. The subject matter of the contract is ICS's need for a "shipping management function" to increase the efficiency and decrease the cost of its shipments of large quantities of various materials. (*See* Cooperation Contract ¶ 1.) The contract contemplates, *inter alia*, the types of cargo for shipment and the amounts to be shipped (*id.* at 1), charter party agreements entered into on behalf of ICS (*id.* ¶¶ 3–6), minimum rates (*id.* ¶ 10), loading and discharge of ships (*id.* ¶¶ 15–16), and inspection of cargoes for import and export (*id.* ¶ 13). It is of no moment in the *Exxon* analysis that STC will seek future charter parties (*id.* ¶ 6), or act as an agent of ICS is so doing (*see id.* ¶ 3). Indeed, STC's contract to deliver shipping services, albeit with the aide of third parties, is similar to the maritime contract in *Exxon* where Exxon promised to supply fuel even if by way of a third party. *See Exxon*, 500 U.S. at 612–13, 111 S.Ct. 2071 (discussing the "Jeddah claim"). Although the Cooperation Contract may have been a prime candidate for the *per se* agency exception to admiralty jurisdiction pre-*Exxon*, after the landmark decision the "true criterion" of a maritime contract-namely, whether the subject matter of the

contract is maritime in nature-is satisfied by its terms.

### b. Preliminary Contract Doctrine

Urging the Court that the preliminary contract doctrine survives *Exxon*, ICS argues that the Cooperation Contract is a garden-variety charter-brokerage agreement and preliminary in nature and thus *per se* excluded from the maritime jurisdiction of the Court under the preliminary contract doctrine. Assuming without deciding that the doctrine survives *Exxon*, the Court finds the doctrine is not applicable here.

For one, the Cooperation Contract is not a charter-brokerage agreement. Unlike a typical charter-brokerage agreement, full satisfaction of the terms of the Cooperation Contract would not lead to a charter between ICS and a third party, but between ICS and STC and STC and a third party. (*See* Cooperation Contract ¶ 6.) Payment to STC for fulfilling ICS's shipping management function is based on freight, deadfreight, demurrage, and detention based on freight differentials calculated on specific voyages (*id.* ¶¶ 7, 10), not on a brokerage commission (*id.* ¶ 10). STC promised to carry insurance that would cover all risks including "damage to hull." (*Id.* ¶ 8.) None of these requirements are characteristic of a typical charter-brokerage agreement.

Nor is the Cooperation Contract otherwise "preliminary." ICS argues that the Cooperation Contract "is an agreement to procure contracts for the use of another's vessels," (Def.'s Mem. at 14), but this is not the case. First, the contract *presently* binds ICS to use STC as exclusive handler of ICS shipping needs (*id.* ¶ 1) to purchase all of its imported goods on FOB basis and sell all of its exported goods on CFR/CIF basis (*id.* ¶ 2), and pay a stated minimum rate (*id.* ¶ 10). It further binds STC to carry Charterer's Liability Insurance (*id.*

¶ 9), organize quality and quantity inspection of cargoes (*id.* ¶ 13), and train an officer of ICS in the shipping management function (*id.* ¶ 14). Second, it is no mere technical difference to say that this is a contract "to procure contracts" as opposed to a contract that contemplates or authorizes entry into other contracts. Were it the former, it would be preliminary for its *object* would be satisfied by entry into the future contract. But STC's entry into future charter parties does not satisfy the terms of the Cooperation Contract. Indeed, one can imagine numerous situations where subsequent contracts and performance on or breach of those contracts would violate the terms of the Cooperation Contract, including specific shipments of, or failures to ship, cargo. That a defendant breaches a maritime contract early in the life of the contract does not in and of itself render the contract too remote to be heard as a maritime claim.

For the reasons stated above, the situation here is distinguishable from those in *Drakos* or *Maritima*. In *Drakos*, appellants were a "maritime brokerage company" and the dispute was over a lost commission promised in an admitted charter party brokerage contract. *See Drakos*, 140 F.3d at 130–31. Here, STC claims to not be in the brokerage business, but instead claims to seek long term contracts of affreightment and signed a contract more aptly described as a contract to operate ICS's shipping management function than a brokerage contract. Although *Maritima* bears more resemblance to this case, it too contains critically different facts. In *Maritima*, the "Memorandum of Agreement" was "not a contract to provide offshore drilling rigs [but] an agreement to *procure* contracts for the future use of defendants' rigs." *Maritima*, 78 F.Supp.2d at 169. As noted above, the purpose of the Cooperation Contract is not to procure shipping contracts. The purpose is to operate

ICS's shipping management function. Though the *Maritima* plaintiffs also intended to enter into contracts with a third party, and then assign rights and obligations to the defendant, that was their sole role; Plaintiffs carried no obligations past the assignment of rights. *Id.* at 164–65. To fulfill its obligations under the Cooperation Contract, STC would have to procure charter parties, but doing so would not satisfy STC's obligation under the contract to supply the shipping management function.

In light of the above considerations, the Court finds that the Cooperation Contract is a maritime contract for the purposes of justifying a Rule B attachment under the admiralty jurisdiction of the United States courts.

### 3. Rule B Attachments in Aid of Foreign Litigation

ICS argues that, although there is a statutory basis for Rule B attachments in cases where a claim is contractually subject to arbitration, *see* 9 U.S.C. §§ 8, 201, no such authority exists with respect to claims subject to foreign litigation. While there are *no* cases that support ICS's contention, ICS makes a policy argument that, were the Court to allow attachments in aid of foreign litigation, "[t]housands of lawsuits would be filed here, even though they have no underlying connection with New York or the U.S. in general, premised merely on the desire for security and the hope that monies of the defendant might be moving through the banking system" a prospect that would leave the Court's docket "utterly clogged" and the banking community "choked with [Rule B attachment] demands." (Def.'s Mem. 16–17.)

█ The Court rejects this argument in favor of the holding stated by the Ninth Circuit in *Polar Shipping v. Oriental Shipping Corp.*, 680 F.2d 627, 633 (9th Cir.1982), that a forum-selection clause providing for a foreign forum does not preclude a Rule B attachment in the United States. The Court finds the following *Polar Shipping* policy rationale sound and applicable:

[A] primary reason for parties to agree to a foreign court selection clause, particularly one that names the English courts, is to achieve a neutral forum and to take advantage of that forum's expertise in admiralty litigation. In many admiralty actions, it would be merely fortuitous if the foreign forum, selected for its neutrality and expertise, also had available assets of the defendant to ensure that a judgment rendered by that forum would be enforceable there.

*Id.* (citations omitted); *see also Staronset Shipping, Ltd. v. North Star Navigation,* 659 F.Supp. 189, 191 (S.D.N.Y.1987) (adopting the reasoning and holding of *Polar Shipping* ). It is fair to say the foreign corporations in this case chose the British Courts for the same reasons stated above, and because ICS had no assets in England, STC had to come to the United States in search of security.

This reasoning remains intact notwithstanding the Second Circuit's holding in *Winter Storm v. TPI,* 310 F.3d 263 (2d. Cir.2002), which allowed for electronic fund transfers (EFTs) to be seized under Rule B. The Second Circuit stated then what is true now, namely that "[m]aritime attachment is available whenever the plaintiff has an *in personam* claim against the defendant which is cognizable in admiralty." *Id.* at 268 (citing 28 U.S.C. § 1333). There is no nationality-based jurisdictional limitation in this Court's admiralty purview and, inasmuch, Rule B seizures of EFTs have since 2002 been available to "every foreign litigant" with a claim or currently in foreign arbitration. (Def.'s Reply 14.) The "flood" ICS warns of is already here, and disal-

lowing attachment in aid of foreign litigation would only save a drop from entering the proverbial bucket.

### 4. Reduction of the Attachment Amount

 In the alternative of the Court vacating the attachment altogether, ICS seeks a reduction in the amount of the attachment claiming that the 30–year period upon which the $75 million attachment was calculated is overstated and against the terms of the Cooperation Contract. (Def.'s Mem. 17–18.) STCs response is that the contract was "to run interminably" and that suing for 30 years showed an "exercise of restraint." (Duffy Aff. Ex. J ¶ 9 (O'Neil Aff.).)

The parties do not contest that the Court has the power, pursuant to Supplemental Admiralty Rule E(6), to reduce the amount of the attachment when good cause is shown. Here, the Court finds that such good cause exists. Even assuming the parties intended the Cooperation Contract was to run "interminably," this can not defeat the plain terms of the contract, which expressly states:

> [This contract] has immediate effect from the time of signing, is valid for an initial period of two (2) years from the date hereof and is automatically renewed thereafter for further two (2) year periods on a rolling basis *unless either of the Parties has acted in material breach of their obligations hereunder* and have failed to remedy that breach . . . .

(Cooperation Contract ¶ 18.) The verified complaint alleges that ICS is in material breach of the Cooperation Contract and that it did not remedy the breach within the time period required by the contract's terms. (*See* Compl. ¶¶ 18–19.) As such, the contract will expire after two years. In the verified complaint, STC calculates damages at minimum $1.1 million in

freight differential per year and $1.4 million in address commissions per year. (*Id.* ¶¶ 20–21) ICS in its motion to vacate does not contest this calculation. As such, the Court finds that the proper amount to be seized with respect to the Cooperation Contract is $5 million which, when added to the claim for breach recited in the first cause of action for $218,109.38, comes to $5,218,109.38. The attachment will be reduced to reflect this amount. Though the Court finds good cause to reduce the amount seized under the Rule B attachment, it takes no position as to the recovery available in the British Courts under British law.

### 5. Request for Counter Security

Though ICS lays out the statutory basis for receiving counter security, it makes no argument as to why it deserves counter security. Indeed, STC claims (and ICS does not rebut) that ICS has not appeared in any of the London actions, and thus has not made any counter claims nor shown that it has or will incur any costs or expenses. As such, the request for counter security is rejected.

## III. CONCLUSION

For the foregoing reasons, ICS's motion to vacate the Rule B attachment is **DENIED**, the application to modify the amount of the attachment is **GRANTED**, and the application for counter security is **DENIED**.

So Ordered.